*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Fund for Animals, Inc.*, No. 18, September Term, 2016. Opinion by Greene, J.

**INSURANCE LITIGATION—UNTIMELY NOTICE—ACTUAL PREJUDICE**
An insured breaches an insurance contract when the insured does not provide timely notice of a claim against it to the insurer in accordance with the insurance contract. Under § 19-110, an insurer may disclaim coverage where the insured breaches the insurance policy, so long as the insurer can establish by a preponderance of the evidence that the breach results in actual prejudice to the insurer. The actual prejudice must be a consequence of the breach. The actual prejudice element requires that the harm be more than possible, hypothetical, speculative, or conjectural. This Court has found actual prejudice in instances where the insured's breach has: precluded the insurer from establishing a legitimate jury issue or presenting potentially outcome-determinative evidence, hampered the insurer from presenting a credible defense, or impeded an insurer's right to involvement or participation in the litigation.

The Fund for Animals, Inc. ("FFA") was insured under a liability policy issued by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"). This case involves three actions: (1) the Endangered Species Act case ("ESA Case"), where FFA and other plaintiffs sued Ringling Brothers and its owner, Feld Entertainment, Inc. ("Feld") for the mistreatment of elephants; (2) the RICO Case, where Feld sued FFA and the other plaintiffs from the ESA Case for paying a witness to testify in order to establish standing to sue Feld in the ESA Case and concealing those payments during discovery; and (3) the Coverage Case, where FFA sued National Union for not providing coverage to FFA when it was sued by Feld in the RICO Case.

In the Coverage Case, National Union was not able to establish any evidence of actual prejudice that it suffered as a result of the late notice from FFA of the RICO Case. The RICO Case was stayed pending the outcome the ESA Case. The stay was lifted after judgment was granted in favor of the defendant, Feld, in the ESA Case. The judge in the ESA Case made several adverse findings against the plaintiffs and FFA. Under the doctrine of collateral estoppel, FFA would be precluded from contesting the same adverse factual findings from the ESA Case in the RICO Case. Those factual findings would be detrimental to FFA's defense in the RICO Case or in settlement negotiations, thus, prejudicing National Union. However, the insurer could not show that the *delayed notice* of the RICO Case resulted in *actual* prejudice. The outcome of the ESA Case and those adverse factual findings would not have changed had National Union been notified earlier of the RICO Case. National Union had no right to intervene in, impact, or influence the ESA Case. Therefore, it was not prejudiced in investigating, settling, or defending the RICO claim. National Union was notified of the RICO Case before settlement, mediation, or a trial had taken place in that action. Accordingly, we affirm the judgment of the Court of Special Appeals.

IN THE COURT OF APPEALS

OF MARYLAND

No. 18

September Term, 2016

_____

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.

v.

THE FUND FOR ANIMALS, INC.

_____

Barbera, C.J.
Greene,
Adkins,
McDonald,
Watts,
Hotten,
Getty,

JJ.

_____

Opinion by Greene, J.

_____

Filed: January 27, 2017

In this case, Petitioner, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), challenges the Court of Special Appeals' holding that Respondent, the Fund for Animals, Inc. ("FFA"), did not cause actual prejudice to National Union as a result of providing late notice of a claim against FFA under a liability insurance policy issued by National Union to FFA. *See* MD. CODE ANN., INS. § 19-110 (1997, 2011 Repl. Vol., 2016 Supp.). This case relates to three actions: (1) the Endangered Species Act case ("ESA Case"), where FFA and other plaintiffs sued Ringling Brothers and its owner, Feld Entertainment, Inc. ("Feld") for the mistreatment of Asian elephants in the Ringling Brothers' Circus; (2) the Racketeer Influenced and Corrupt Organizations Act case ("RICO Case"), where Feld sued FFA and the other plaintiffs named in the ESA Case for improper conduct, including paying a witness to testify in order to establish standing to sue Feld in the ESA Case and concealing those payments during discovery; and (3) the Coverage Case, where FFA sued National Union, its insurer, for not providing coverage to FFA when it was sued by Feld in the RICO Case.

This appeal stems from the coverage dispute. The findings in the ESA Case were adverse to FFA and could have been used against it in the RICO case; thus, prejudicing FFA's insurer, National Union. FFA argues that although notice of the RICO claim was late under the policy, National Union, at best, could have "monitored" the ESA Case and could not have intervened in, impacted, or influenced the ESA Case. Moreover, National Union was notified of the RICO Case before settlement, mediation, or a trial had taken

place in the RICO action. Therefore, late notification of the RICO Case[1] was not prejudicial to National Union. Accordingly, as a matter of law, National Union was not prejudiced in investigating, settling, or defending the RICO claim as a result of any delay in receiving notice of claims brought against the insured. Therefore, we affirm the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

### Background

The relevant facts are taken from evidence and testimony presented at trial. FFA, a nonprofit organization dedicated to animal protection issues and an affiliate of the Humane Society of the United States ("HSUS"), was insured under a liability policy issued by National Union. The insurance was purchased to protect HSUS and its affiliates against the risks of lawsuits and claims made against them. National Union issued a "Not–For–Profit Individual and Organization Insurance Policy" to HSUS, which was in effect from January 7, 2006 through June 8, 2008 ("the 2007 Policy"). This was a "claims-made-and-

---

[1] The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968, which is directed at "racketeering activity"—defined in § 1961(1) to encompass, *inter alia*, acts "indictable" under specific federal criminal provisions, including mail and wire fraud—provides in § 1964(c) for a private civil action to recover treble damages by any person injured in his business or property "by reason of a violation of section 1962." Section 1962(c) prohibits conducting or participating in the conduct of an enterprise "through a pattern of racketeering activity."

*Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 479, 105 S. Ct. 3275, 3276, 87 L. Ed. 2d 346, 348 (1985).

2

reported-policy."[2] A "Claim" is defined in the policy to mean "(1) a written demand for monetary relief or (2) a civil . . . proceeding for monetary . . . relief which is commenced by: (i) service of a complaint or similar pleading[.]" ¶ 2. (b)(1)-(2)(i).

The "Notice/Claim Reporting Provisions" section under Clause 7 of the insurance policy states "[t]he Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable and either: (1) anytime during the Policy Year . . . or (2) within 30 days after the end of the Policy Year . . . as long as such Claim is reported no later than 30 days after the date such claim was first made against an insured." ¶ 7.(a)(1)-(2). "A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any Insured[.]" ¶ 7.

Further, pursuant to the policy, FFA was responsible for defending itself, and National Union had a duty to advance defense costs. The insured's right to tender its defense i.e., transferring the obligation of the defense, and all costs associated with the insurer terminates if not exercised within 30 days of the date the claim is first made pursuant to Clause 7. ¶¶ 1 & 8. "Provided that the Insureds [including FFA] have complied

---

[2] The "claims-made-and-reported-policy" provided that claims made against FFA and reported to National Union during the policy period would be covered by the policy. This is distinct from a "claims-made" policy which only requires that a claim arise during the policy period. This Court has held that § 19-110 applies to both types of policies. "[Section] 19-110 mandates that notice provisions be treated as covenants, such that failure to abide by them constitutes a breach of the policy sufficient for the statute to require the disclaiming insurer to prove prejudice." *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 326 n. 21, 13 A.3d 1268, 1284 n. 21 (2011) ("Notice provisions, even in claims-made-and-reporting policies, must be deemed covenants such that failure to abide by them constitutes a breach of the policy sufficient to make § 19-110 applicable to such policies.").

3

with the foregoing, the Insurer [National Union] shall be obligated to assume the defense of the Claim . . . [o]nce the defense has been so tendered, the Insured [FFA] shall have the right effectively to associate with the Insurer [National Union] in the defense of such Claim, including, but not limited to negotiating a settlement." ¶ 8.

Although, the coverage dispute relates to both the ESA Case and the RICO Case, we primarily address the Coverage Case in this appeal. The other two cases are relevant because they form the basis as to why National Union believes it was actually prejudiced, enabling it to disclaim coverage under its policy. The ESA Case is a case in which FFA was the plaintiff and adverse factual findings and a judgment were entered against FFA. Those adverse findings could have been raised against FFA in the RICO Case on grounds of collateral estoppel. National Union had no duty to defend FFA in the ESA Case because National Union provided defense coverage and FFA was acting as a plaintiff in the ESA Case. Therefore, National Union could not have affected the outcome of the ESA proceedings. In the RICO Case, FFA was sued by Feld, a defendant in the ESA Case, for misconduct that allegedly occurred during the prosecution of the ESA Case. In the Coverage Case, FFA sued its insurer, National Union, for failing to provide coverage to it. National Union disclaimed coverage on the grounds that it received late notice of the RICO Case. It further claimed that had National Union known earlier it could have stepped in and "monitored" or advised FFA in the ESA Case. Intervention, National Union claims, would have prevented the adverse factual findings which prejudiced FFA's defense in the RICO Case.

4

In the ESA Case, FFA, an organizational plaintiff, along with other organizational plaintiffs and an individual plaintiff, Thomas Rider, sued Ringling Brothers and its owner, Feld. While the ESA Case was pending, Feld brought the RICO Case against FFA and the other organizational plaintiffs for allegedly bribing the individual plaintiff to falsely testify and commit other criminal acts, in order to establish standing to sue Feld. Feld sought to recover damages in the form of attorneys' fees and costs incurred in defending the ESA Case. FFA did not notify National Union of the RICO claim until over two years after the claim had been filed. By that time, the court in the ESA Case had ruled in favor of the defendant, Feld, on the ground that the ESA organizational plaintiffs, including FFA, lacked standing. The court also made several factual findings, including that the organizational plaintiffs had paid the individual plaintiff for testimony that was false and that those payments were concealed during discovery. National Union denied coverage on the grounds that FFA failed to provide timely notice. Subsequently, FFA brought the Coverage Case against National Union, which in turn defended on the grounds that it was prejudiced by the late notice. National Union claimed actual prejudice because it believed FFA was precluded, in the RICO Case, from contesting many of the facts found by the court in the ESA Case as those facts undermined any defense FFA might have raised.

**The ESA Case (Not Covered by the 2007 Policy)**

The ESA Case was brought in 2000 in the United States District Court for the District of Columbia before the Honorable Emmet G. Sullivan. The ESA Case was not covered by the 2007 Policy because the Policy provided coverage to FFA in defense of claims made against it by another party, not in the case where FFA was the plaintiff. FFA,

5

the American Society for the Prevention of Cruelty to Animals ("ASPCA"), the Animal Welfare Institute ("AWI"), and Thomas Rider sued Feld and Ringling Brothers for declaratory and injunctive relief, alleging Ringling Brothers' mistreated Asian elephants in its circus training techniques, violating the Endangered Species Act, 16 U.S.C. § 1531 *et seq*.

The suit was brought under § 1540(g), the citizen-suit provision of the ESA, which requires standing under the "case or controversy" provision of Article III of the United States Constitution, meaning at least one plaintiff must make a showing:

> (1) that the plaintiffs have suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there be a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Bennett v. Spear*, 520 U.S. 154, 167, 117 S. Ct. 1154, 1163, 137 L.Ed.2d 281, 298 (1997) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561, 112 S. Ct. 2130, 2136, 119 L.Ed.2d 351, 364 (1992)).

Mr. Rider alleged he was emotionally attached to the elephants because he had worked for Ringling Brothers for two years, tended the elephant barns, worked as a "handler", and referred to them as his "girls." He claimed that he had witnessed their mistreatment by the Ringling Brothers' employees. Further, he explained that he wished to visit the elephants again and work with them, but could not because he feared he would experience aesthetic and emotional injury from witnessing their scars and behavioral tics.

6

Feld filed a motion to dismiss for lack of Article III standing asserting Mr. Rider did not suffer any cognizable and redressable injury and thus the plaintiffs, including FFA, could not establish standing. The district court granted the motion to dismiss. That decision was appealed to the United States Court of Appeals for the District of Columbia Circuit, which reversed and held there was a cognizable and redressable injury.[3] *ASPCA v. Ringling Bros. and Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003).

In August 2007, Feld filed the RICO Case (discussed previously) as a separate action against FFA and the other organizational plaintiffs. While the RICO Case was pending, the ESA Case was tried as a bench trial and lasted for six weeks, from February through March of 2009. In December of 2009, the district court entered judgment in favor of Feld and held that the plaintiffs failed to establish Article III standing. Accordingly, the court determined that it lacked jurisdiction and declined to reach the merits of whether Feld violated the ESA. *ASPCA v. Feld Entertainment, Inc.*, 677 F. Supp. 2d 55, 91, 97–98 (D.D.C. 2009). The court made findings of fact and rejected Mr. Rider's testimony, concluding he was "essentially a paid plaintiff and fact witness who is not credible." 677 F. Supp. 2d at 67. The court also found that since March of 2000, Mr. Rider's sole source of income was coming from payments made by animal rights advocates, including the organizational plaintiffs. 677 F. Supp. 2d at 72. It was determined that payments were

---

[3] Although FFA and the other plaintiffs appear to have won their case on appeal to the District of Columbia Circuit, it is unclear from the record why on remand the plaintiffs dismissed that case without prejudice. In place of the original case, the plaintiffs filed a new lawsuit making the same allegations against Feld and Ringling Brothers. The Animal Protection Institute joined the new lawsuit as a plaintiff.

made directly to him from the law firm representing the plaintiffs, Meyer, Glitzenstein & Crystal ("MGC") and indirectly from grants from the Wildlife Advocacy Project ("WAP"), a non-profit run by two partners in MGC. 677 F. Supp. 2d at 74. The court found:

> [T]he primary purpose is to keep Mr. Rider involved with the litigation, because he is the only plaintiff who alleges a personal and emotional attachment to the elephants and an aesthetic injury based on the alleged mistreatment he claims to have witnessed while working for [Feld].

677 F. Supp. 2d at 79. Further, the court determined that the plaintiffs used the United States mail system to make payments. 677 F. Supp. 2d at 77. Moreover, those payments "were not disclosed initially in discovery, by both omissions and affirmatively false statements." 677 F. Supp. 2d at 83. (As discussed below, these findings are all relevant to the RICO Case because they form the basis for a violation of the RICO statute, and mail and wire fraud.). On appeal, the Court of Appeals for the District of Columbia Circuit affirmed the district court's findings. *See ASPCA v. Feld*, 659 F.3d 13 (D.C. Cir. 2011).

In March of 2013, Judge Sullivan granted Feld's motion as a prevailing party for attorneys' fees (filed in April 2012), under a fee-shifting provision of the ESA. 16 U.S.C. § 1540(g)(4). He further found that the ESA Case was "meritless, frivolous, and vexatious" and directed the parties to submit recommendations for further proceedings to determine the amount of attorneys' fees Feld had incurred.

**The RICO Case (Covered by the 2007 Policy)**

As mentioned in the above discussion, during the ESA case, Feld filed the RICO Case in the United States District Court for the District of Columbia in August of 2007 as a separate action naming the organizational plaintiffs from the ESA Case, including FFA,

8

as defendants. Feld alleged that the RICO defendants engaged in illegal acts in the ESA Case, including paying Mr. Rider over $100,000 to falsely testify to establish emotional injury from the alleged mistreatment of elephants and attempting to conceal payments that were in the form of bribes, illegal gratuities, mail fraud, wire fraud, money laundering, and obstruction of justice. Feld sought damages in attorneys' fees and costs incurred in defending the ESA Case.

The complaint and summons in the RICO Case were served on FFA in September 2007. However, National Union was not notified by FFA of the RICO Case when the complaint was served, nor at any time during the 2007 Policy period (before June 8, 2008). In November 2007, Judge Sullivan, in the RICO Case, granted the defendants' "Motion to Temporarily Stay All Proceedings" pending the resolution of the ESA Case and indicated that

> [g]iven that the ESA Action is still ongoing, and because [Feld] has no choice but to continue to defend the ESA suit regardless of the outcome of its RICO claim, [Feld's] damages [in the form of attorneys' fees and costs incurred in defending the ESA Case] are unascertainable at this point.

*Feld Entertainment, Inc. v. ASPCA*, 523 F. Supp. 2d 1, 4 (D.D.C. 2007). It was not until January 15, 2010 that the court lifted the stay in the RICO Case. This was approximately one month after Feld had prevailed in the ESA Case.

On March 1, 2010, Roger Kindler, general counsel for HSUS and its affiliates (including FFA) gave their insurance broker notice of Feld's amended complaint in the RICO Case. The letter stated HSUS and its affiliates demand coverage under the National Union Policy for the 2010 term year ("the 2010 Policy"), which was substantially similar

9

to the 2007 Policy (FFA was an "Additional Insured" on the 2010 Policy as well as the 2007 Policy). The insurance broker forwarded the notice and copy of the amended complaint to National Union. National Union's claims administrator, Chartis, requested the original complaint in the RICO Case. Mr. Kindler forwarded a copy of the original complaint to Chartis and also notified it that the RICO Case had been stayed by the district court pending the outcome of the ESA Case and that the district court had scheduled mediation for both cases in June.

On May 26, 2010, Chartis sent a letter to HSUS and FFA disclaiming coverage both under the 2010 and 2007 Policies because the RICO claim was made against FFA in 2007 and notice was not given during the 2007 Policy term (from January 7, 2006 through June 8, 2008). Mr. Kindler responded, on June 16, 2010, and contested the disclaimer. He explained that there was "on-going, formal mediation in the District of Columbia involving all parties, that ha[d] the potential of resolving the nest of claims between Feld [] and the charities and individuals named in the Amended RICO Complaint" and "[i]f the mediation fails, the parties and their insurance carriers [were] looking forward to, it is safe to say, years of intense litigation and the associated costs. Chartis should not be sitting on the sidelines." National Union did not respond and chose not to get involved in the RICO Case. FFA hired attorneys, engaged in mediation, filed a motion to dismiss the amended RICO complaint, pursued (unsuccessfully) an interlocutory appeal from the denial of the motion to dismiss, and was involved in discovery for over six months.

In March of 2013, Judge Sullivan granted Feld's motion for attorneys' fees in the ESA Case and directed the parties to submit recommendations for the appropriate amount

of fees and to determine whether further proceedings were necessary. In early 2014, FFA and the other organizational defendants in the RICO Case and Feld engaged in settlement negotiations. In May 2014, Feld settled its claim for $15.75 million. In addition, Feld agreed to dismiss, with prejudice, the RICO Case as well as the pending claim for attorneys' fees in the ESA Case. FFA's share of the settlement responsibility was approximately $2.54 million.

## The Coverage Case

Before Judge Sullivan ruled on Feld's motion for attorneys' fees in the ESA Case and while the RICO Case was pending, FFA filed suit ("Coverage Case"), from which this appeal stems, against National Union in the Circuit Court for Montgomery County on September 6, 2012. FFA alleged that National Union breached the 2007 Policy by disclaiming coverage in the RICO Case.

National Union argued that Virginia law applied, which provided that late notice alone was sufficient to support disclaiming coverage and moved for summary judgment in July of 2014. On December 11, 2014, the court denied the motion and ruled that Maryland law applied. Further, the court explained that under § 19-110, to disclaim coverage based on late notice of the RICO Case, National Union had to prove by a preponderance of the evidence that it suffered actual prejudice due to the late notice. *See* § 19-110. In addition, because National Union did not present evidence in support of its motion to show that, "had [it] been given earlier notice, it would have joined the ESA trial team and changed the result of that case," there was a genuine dispute of material fact as to the issue of actual prejudice. National Union's motion for reconsideration was also denied.

11

A four-day jury trial took place beginning on January 12, 2015. FFA presented four witnesses: Michael Markarian, the president of FFA; George Wade, the CFO of HSUS; Roger Kindler, general counsel for HSUS; Roger Zuckerman, a partner at Zuckerman Spaeder, the law firm that represented FFA in the RICO Case. Mr. Markarian testified that FFA did not notify National Union of the RICO Case when it was filed in 2007 because they viewed the suit as an "intimidation tactic." They "did not view it as a serious threat" because the RICO Case was stayed almost immediately after the filing. Mr. Kindler testified as to discussions with Mr. Markarian and MGC, the law firm representing the plaintiffs in the ESA case, in 2007. He indicated that when the RICO Case was filed, there was a belief that it was filed as a "litigation tactic" in Feld's defense of the ESA Case, not as a "substantive suit." Moreover, he believed, "you save your insurance until you need it" and FFA did not need the insurance in 2007. Mr. Zuckerman testified as to the decisions made by the firm in defending and settling the RICO Case. The lawyers believed FFA had a reasonable chance of prevailing, but the potential damages were too great to justify risking trial, and "the ESA [C]ase . . . had virtually no impact on the settlement decision [in the RICO case]." He and others at his firm dedicated a large amount of time to researching collateral estoppel and concluded it would not preclude FFA from litigating facts decided against it in the ESA Case.

At the close of FFA's coverage case, National Union moved for judgment on the grounds that the evidence presented by FFA proved National Union suffered actual prejudice as a matter of law and FFA had failed to prove its damages with reasonable certainty. The court reserved its ruling on the motion until the close of all the evidence.

Next, National Union called its sole witness, Maureen Conboy, the assistant vice-president for AIG Claims, Inc. (formerly Chartis), and the individual who supervised litigation. Ms. Conboy testified that National Union "lost the opportunity to participate in the decision to stay the [RICO Case,] . . . to monitor the ESA [Case,] and to try to settle the stayed [RICO Case] before Judge Sullivan made his findings in December of 2009 and before Feld incurred another 11 million or so dollars in fees in the ESA [Case] during that period when [National Union] d[id not] know anything about this." She mentioned that if the notice was timely, National Union could have assigned an attorney to represent FFA in the RICO Case and could have collaborated with FFA lawyers representing FFA in the ESA Case. On cross-examination, Conboy conceded that National Union could not have appointed counsel to represent FFA in the ESA Case. Rather, they could have had panel counsel, a firm chosen by the insurer, enter an appearance in the RICO Case and "monitor" the ESA Case.

At the close of evidence, National Union renewed its motion for judgment and argued it suffered actual prejudice as a matter of law, referencing cases under Maryland law holding that actual prejudice exists as a matter of law when there was no timely notice of the claim until after a verdict or judgment had been entered. National Union argued that here, there was no notice of the RICO Case until after judgment was entered in the ESA Case. Further, National Union contended that it did not matter that the judgment in question was entered in the ESA Case, and not in the RICO Case, because the damages Feld sought in the RICO Case were fees incurred in defending the ESA Case and, under collateral estoppel, Judge Sullivan's factual findings in the ESA Case were preclusive of

13

relitigation of certain issues. Thus, National Union posited, FFA's defense in the RICO Case was substantially impacted by the adverse factual findings made in the ESA Case. FFA responded that National Union waived the collateral estoppel argument by not raising it in its answer and, regardless, the doctrine would not apply to Judge Sullivan's factual findings in the ESA Case because they were not necessary to the judgment in that case. FFA also noted that because Mr. Zuckerman testified that the firm's decision to settle the RICO Case was not predicated on a concern about the preclusive effect of findings in the ESA Case, it was a jury question whether the defense of the RICO Case was impaired by the judgment in the ESA Case. Thus, FFA argued that prejudice as a matter of law did not exist and under Maryland law the issue had to be submitted to a jury.

In granting National Union's motion, the Circuit Court for Montgomery County ruled that the factual findings from the ESA Case—(1) that "Rider's testimony was purchased by [the ESA plaintiffs, including FFA]"; (2) that FFA "had lied in discovery, and/or at the very least concealed evidence of those payments"; and (3) that FFA tried to "disguise the payments [to Rider] . . . as payments for media services"—were "material and relevant to the [standing] issue before [Judge Sullivan in the ESA Case]" and were the basis for the judgment entered in that case. Therefore, the Circuit Court concluded that these facts were "finally determined" in the ESA Case. FFA had the opportunity to "fully litigate those issues" and thus, collateral estoppel in a trial in the RICO Case would preclude FFA from contesting those same facts and FFA would be bound by them. Those facts would be significantly detrimental to FFA's defense in the RICO Case. The Circuit Court further rejected FFA's argument that collateral estoppel was waived and concluded,

14

in the alternative, that even if collateral estoppel did not apply in the RICO Case and factual findings in the ESA Case would not be binding on FFA, the findings necessarily would create "a substantial problem in [the RICO Case] for [National Union] . . . in terms of evaluating the settlement of [the RICO Case]." The court finally concluded that Judge Sullivan's findings in the ESA Case would drive up the settlement value of the RICO Case, thereby prejudicing National Union, as a matter of law.

On March 12, 2015, the Circuit Court for Montgomery County entered judgment in favor of National Union. FFA timely appealed to the Court of Special Appeals. The Court of Special Appeals reversed the judgment of the Circuit Court and remanded the case to the Circuit Court. The intermediate appellate court noted that if FFA had moved for judgment the court would have directed the Circuit Court to enter judgment in favor of FFA on liability. Further, if FFA did move for judgment on remand the trial court should enter judgment in FFA's favor. The Court of Special Appeals held:

> In this case, we hold that when an insured gives late notice and during the period of delay in notification the insured's defense becomes impaired, to the actual prejudice of the insurer, the insurer may disclaim coverage only if there is a causal link between the late notice and the prejudice.

*Fund for Animals, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 226 Md. App. 644, 647, 130 A.3d 1155, 1157 (2016).

National Union filed a petition for writ of certiorari and FFA filed a cross-petition in this Court. We granted the Petition for Certiorari to answer the following questions:

1. Did [the Court of Special Appeals] err in holding that the actual prejudice standard in Insurance Art. § 19-110 requires an insurer to prove that, had it received timely notice, the outcome would have been different?

15

2. Did [the Court of Special Appeals] exceed its authority by instructing the trial court on remand to permit and grant a belated motion for judgment, when such a motion was never filed at the time of trial?

We also granted the cross-petition for writ of certiorari to answer the following questions:

1. Did Petitioner waive the affirmative defense of collateral estoppel by failing to plead that defense in its answer or mention it during discovery?

2. Does collateral estoppel apply to the findings made in the Endangered Species Act case?

*Nat'l Union Fire Ins. Co. v. Fund for Animals*, 448 Md. 29, 136 A.3d 816 (2016).

We shall hold that in order to disclaim coverage under § 19-110, an insurer must show, by a preponderance of the evidence, that the delay in giving notice resulted in actual prejudice to the insurer. "[T]he statute applies to require [the insurer] to show how it was prejudiced by [the insured's] late-delivered notice in investigating, settling, or defending of the . . . actions." *Sherwood Brands, Inc.*, 418 Md. at 331, 13 A.3d at 1287. In other words, the burden is on the insurer to establish that the breach or failure to give timely notice resulted in actual prejudice to the insurer. In addition, the actual prejudice element requires that the insurer show that the harm to the insurer from the lack of required notice is more than theory or conjecture. Here, National Union was not able to produce sufficient evidence of the impairment of its defense as a result of National Union receiving late notice of the RICO claim. Although the application of collateral estoppel would prejudice National Union, it could not show that it was the *late notice* of the RICO claim that resulted in actual prejudice because the outcome of the factual findings would not have changed

16

had National Union been notified of the RICO Case earlier. That is so because National Union had no right to intervene in the ESA Case or affect its outcome.

## STANDARD OF REVIEW

National Union's motion for judgment as a matter of law, on the issue of actual prejudice, is reviewed under a *de novo* standard and without deference given to the lower court. *District of Columbia v. Singleton*, 425 Md. 398, 406–07, 41 A.3d 717, 721–22 (2012); *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 393–94, 31 A.3d 583, 587 (2011) ("We review the trial court's grant of defendants' motion for judgment *de novo*, considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." (citing Md. Rule 2-519)). Statutory interpretation of § 19-110 is also reviewed *de novo*. *Allen v. State*, 440 Md. 643, 667, 103 A.3d 700, 714 (2014). Furthermore, an application of collateral estoppel "is a legal conclusion that this Court reviews *de novo*." *Garrity v. Md. State Bd. of Plumbing*, 447 Md. 359, 368, 135 A.3d 452, 458 (2016). *See also Elec. Gen. Corp. v. Labonte*, 229 Md. App. 187, 202, 144 A.3d 856, 865 (2016).

As for the Court of Special Appeals' decision to consider an alleged "unpreserved issue," this Court reviews that judgment under a deferential abuse of discretion standard. *Jones v. State*, 379 Md. 704, 715, 843 A.2d 778, 785 (2004). "[W]e respect the judgment of the Court of Special Appeals in determining whether it needed to consider the issue for the proper execution of justice and unless upon our review that court abused its discretion under the Rule, we will not substitute our judgment for theirs." *Id.*

17

## DISCUSSION

### Parties' Contentions

National Union contends that the judgment of the Court of Special Appeals should be reversed because the intermediate appellate court imposed an incorrect standard under § 19-110 for proving actual prejudice and holding that National Union's lack of control over the ESA Case was dispositive of the prejudice issue. In addition, National Union maintains that FFA's late notice caused National Union to lose the opportunity to mitigate its risk prior to entry of the adverse ESA judgment, thus, causing National Union actual prejudice. Moreover, according to National Union, collateral estoppel would be applied against FFA in the RICO Case to the detriment of National Union. In addition, National Union maintains that it was not required to plead collateral estoppel as an affirmative defense in the Coverage Case because it was only raising actual prejudice from late notice of the RICO Case as a defense to the breach of the insurance contract. In other words, National Union contends that the doctrine of collateral estoppel was only being used as an argument to support the defense of actual prejudice. Further, National Union asserts that issues of insufficiency of evidence and FFA's entitlement to judgment as a matter of law were never presented or decided by the Circuit Court. According to National Union, this Court should review whether the Court of Special Appeals abused its discretion in essentially instructing FFA, on remand, to move for judgment on the previous trial record and directing the Circuit Court to grant it. Finally, National Union urges that the case be remanded for a new trial to be tried in accordance with any new standard.

18

FFA, however, contends that the trial court erred as a matter of law in ruling that the evidence conclusively proved actual prejudice. National Union failed to show that prejudice resulted from FFA's untimely notice to National Union of the RICO Case. According to FFA, the uncontradicted evidence at trial was that judgment in the ESA Case "had a negligible effect on [FFA's] decision to settle the RICO Case." Moreover, FFA maintains that any prejudice to its defense in the RICO Case based on allegedly binding adverse findings from the ESA Case was hypothetical. Further, according to FFA, National Union waived collateral estoppel by not raising it in its answer as required by Md. Rule 2-323(g)(4).

## Actual Prejudice

According to Maryland law, an insurer providing a liability insurance policy may disclaim coverage if an insured breached the policy by giving late notice of a claim and establishes by a preponderance of the evidence that late notice resulted in actual prejudice to the insurer.

> An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

INS. ART., § 19-110.

The law "permits an insurer to disclaim coverage on the ground that the insured has breached the policy by failing to cooperate with the insurer only if the insurer establishes that the lack of cooperation has resulted in actual prejudice to the insurer." *Allstate Ins.*

19

*Co. v. State Farm Mut. Auto. Ins. Co.*, 363 Md. 106, 108, 767 A.2d 831, 832 (2001). In order for § 19-110 to be in play, the insured must breach the insurance policy "by failing to cooperate with the insurer or by not giving the insurer requisite notice." *Sherwood Brands, Inc.*, 418 Md. at 312, 13 A.3d at 1275.

This Court has rejected a per se approach, which would allow the finding of actual prejudice for any breach by the insured—instead, the actual prejudice must be a consequence of the breach. *Allstate Ins. Co.*, 363 Md. at 124, 767 A.2d at 841. We have also rejected a but-for approach, which would allow a finding of actual prejudice if but for the insured's breach there was a substantial likelihood the results at trial would have been different. *Id.* The breach nonetheless must result in actual prejudice. A but-for analysis would require that no prejudice would result in the absence of a breach; however, the "results in actual prejudice" element simply means that actual prejudice came about because of, or as a consequence of, the breach.

The actual prejudice element requires that the harm be more than possible, theoretical, hypothetical, speculative, or conjectural. This Court has found actual prejudice in instances where the insured's breach has: precluded the insurer from establishing a legitimate jury issue or presenting potentially outcome-determinative evidence, *Allstate Ins. Co.*, 363 Md. at 127–30, 767 A.2d at 843–44; hampered the insurer from presenting a credible defense, *Allstate Ins. Co.*, 363 Md. at 127–28, 767 A.2d at 843; or impeded an insurer's right to involvement or participation in the litigation, *Prince George's Cnty. v. Local Gov't Ins. Trust*, 388 Md. 162, 190, 879 A.2d 81, 98 (2005); *Washington v. Federal Kemper Ins. Co.*, 60 Md. App. 288, 296, 482 A.2d 503 (1984).

20

"[W]e believe that the proper focus should be on whether the insured's willful conduct has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability, either liability *vel non* or for the damages awarded." *Allstate Ins. Co.*, 363 Md. at 127–28, 767 A.2d at 843. This requires "that the insurer show that the failure of cooperation has, in a significant way, precluded or hampered it from presenting a credible defense to the claim." *Id.* "If the insured violates the notice provision without harming the interests of the insurer—i.e. without prejudice—then there is no reason to deny coverage." *Local Gov't Ins. Trust*, 388 Md. at 185, 879 A.2d at 95. "[P]ossible, theoretical, conjectural, or hypothetical prejudice is not enough to satisfy section 19–110; prejudice cannot be surmised or presumed from the mere fact of delay." *Oliff–Michael v. Mut. Benefit Ins. Co.*, 262 F. Supp. 2d 602, 604 (D.Md.2003); *Gen. Accident Ins. Co. v. Scott*, 107 Md. App. 603, 615, 669 A.2d 773, 779 (1996) ("[A]n insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical").

> The requirement of "actual prejudice" means that an insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical . . . (defining "actual" as "existing in fact; real", "existing or acting at the present moment"). Nor is it enough to surmise harm that may have occurred by virtue of the passage of time; prejudice cannot be presumed from the length of the delay.

*Gen. Accident Ins. Co.*, 107 Md. App. at 615, 669 A.2d at 779 (citation omitted) (holding that the following statements were conclusory allegations and insufficient, as a matter of law, to raise a genuine dispute as to whether the insured suffered actual prejudice: "(1) [insured] 'could not fully investigate the underlying facts,' such as by taking 'timely'

21

statements from witnesses, 'photographing any property damage,' or investigating the scene of the accident; (2) it could not evaluate its potential exposure; (3) it could not participate in the decision as to whether to submit the case to arbitration; and (4) it could not decide whether to 'set high/low parameters.'").

In the case at bar, the RICO Case was dormant for over two years, however, the mere passage of time is not enough to establish actual prejudice. *Hartford Accident & Indem. Co. v. Sherwood Brands, Inc.*, 111 Md. App. 94, 111, 680 A.2d 554, 562 (1996) (holding no prejudice occurred with a delay over two years and six months), *vacated on other grounds,* 347 Md. 32, 698 A.2d 1078; *Woodfin Equities Corp. v. Harford Mut. Ins. Co.*, 110 Md. App. 616, 656, 678 A.2d 116, 135 (1996) (holding no prejudice occurred even when insured gave insurer notice over six years after the date of loss), *vacated on other grounds,* 344 Md. 399, 687 A.2d 652 (1997); *Gen Accident Inc. Co.*, 107 Md. App. at 606, 669 A.2d at 775 (holding no prejudice occurred with a delay over two years and five months). The Court of Special Appeals has stated "[a]s we recently made clear . . . actual prejudice may not be presumed from the mere passage of time—even when notification to the insurer occurred almost two and one-half years after the accident." *Woodfin Equities Corp.*, 110 Md. App. at 658, 678 A.2d at 136.

Although the insured bears the burden to prove it is entitled to coverage under the policy, the insurer has the burden of proving it is actually prejudiced from the late notice; "allocating the burden to the insurer encourages the insurer to undertake a timely preliminary investigation." *Local Gov't Ins. Trust*, 388 Md. at 188, 879 A.2d at 97. National Union neither met its burden nor showed by "affirmative evidence that the delay

22

in giving notice ha[d] resulted in actual prejudice to the insurer." *See Sherwood Brands, Inc. v. Hartford Accident & Indem. Co.*, 347 Md. 32, 42, 698 A.2d 1078, 1083 (1997).

In the Coverage Case, it was FFA's burden to prove it was entitled to coverage in the RICO Case. In defending itself, National Union had the burden to prove that late notice of the claim resulted in actual prejudice. In order for National Union to obtain a judgment as a matter of law on the defense of actual prejudice, the evidence, viewed most favorably to FFA, had to compel the conclusion that actual harm to National Union resulted from the delay in receiving notice of the RICO claim and that no reasonable jury could find otherwise. *Cf. Willis v. Ford,* 211 Md. App. 708, 716, 66 A.3d 112, 116 (2013) (to obtain judgment as a matter of law on defense of contributory negligence, defendant "was required to show that there was no evidence from which the jury could find" that the plaintiffs acted reasonably); *Lindenberg v. Needles*, 203 Md. 8, 14, 97 A.2d 901, 903 (1953) ("[C]ontributory negligence cannot be found as a matter of law, unless the evidence permits of but one interpretation which shows some prominent and decisive act in regard to which there is no room for ordinary minds to differ.").

> [W]hen a defendant moves for judgment based on an affirmative defense, or upon the legal insufficiency of the plaintiff's evidence, the trial judge must determine if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, and if there is, the motion must be denied and the case submitted to the jury. It is only when the facts and circumstances only permit one inference with regard to the issue presented, that the issue is one of law for the court and not one of fact for the jury. An appellate court must review the grant or denial of a motion for judgment by conducting the same analysis as the trial judge.

*Thomas*, 423 Md. at 394, 31 A.3d at 588 (citations and internal quotation marks omitted).

23

Section 19-110 requires the insurer to show how it was prejudiced by the insured's late notice in investigating, settling, or defending of the underlying actions. *Sherwood Brands, Inc.*, 418 Md. at 331, 13 A.3d at 1287 ("Sherwood 'breached the policy . . . by not giving the insurer required notice' as provided in § 19-110, and, thus, the statute applies to require Great American to show how it was prejudiced by Sherwood's late-delivered notice in investigating, settling, or defending of the Massachusetts and Israeli actions."). Ms. Conboy, on behalf of National Union, testified regarding what National Union might have done differently if it had been given earlier notice by FFA. National Union argues that it would have appointed its own panel attorney to defend FFA in the RICO Case; monitored the ESA Case; participated in the decision to stay the RICO Case; and tried to settle the RICO Case before Judge Sullivan made his factual findings in December of 2009.

We agree with FFA's response to this possible or hypothetical prejudice. Ms. Conboy acknowledged that the most counsel could have done in the ESA Case was to monitor it and keep National Union "apprised of what was happening in the ESA Case so that [it] would . . . know if anything . . . potentially bad was going to happen that would affect the [RICO Case]." FFA points out that National Union's counsel could not have controlled prosecution of the ESA Case nor could it have intervened. Even if National Union had received earlier notice, its involvement in the ESA Case would have been speculative because its involvement would have been dependent upon FFA's consent. Because National Union argues it suffered prejudice based on an inability to participate in litigation in which it had no actual *right* to participate, any prejudice caused by the late notice is conjectural. Moreover, prejudice in the form of an inability to participate in

24

litigation is not a result of late notice, it is the result of not having any right to participate in that litigation at all.

Furthermore, by August of 2007, the point at which National Union expected to have received notice of the RICO claim, the direction of the ESA Case was well established and it was apparent that the organizational plaintiffs had been paying Rider since 2001. Additionally, the plaintiffs had already provided discovery responses that Judge Sullivan later found to be incomplete and misleading. Moreover, there is no evidence that by appointing a panel attorney to monitor the ESA Case, National Union would have in any way impacted the outcome of that Case. Similarly, there is no evidence that had National Union appointed counsel for FFA in the RICO Case in 2007, that the case would not have been stayed and decided before the ESA Case. This is because the allegations in the RICO Case were premised on the findings entered against FFA in the ESA Case and the damages were fees incurred and continued to be incurred in the ESA Case. Judge Sullivan, who presided in both cases, found that the decision in the RICO Case had to await the outcome of the ESA Case. Lastly, there was no evidence that had National Union been notified in 2007 rather than 2010, the RICO Case would have settled or for a sum less than the actual settlement in 2014. There is no legitimate reason advanced as to why Feld would have wanted to settle the RICO Case while the ESA Case was pending.

National Union analogizes this case to *Local Gov't Ins. Trust* and *Kemper*. *See Local Gov't Ins. Trust*, 388 Md. at 162, 879 A.2d at 98; *Washington v. Federal Kemper Ins. Co.*, 60 Md. App. at 288, 482 A.2d at 503. However, the insurer's right to participate in a claim distinguishes the case *sub judice* from those cases. In those cases, the insured

failed to notify the insurer of a claim until after that claim had gone to trial and a judgment had been entered against the insured. *Local Gov't Ins. Trust*, 388 Md. at 190, 879 A.2d at 81; *Fed. Kemper Ins. Co.*, 60 Md. App. at 290–91, 482 A.2d at 504. Further, in those cases, if notice had been timely, the insurer could have involved itself in the litigation by appointing counsel, investigating the claim, directing the defense, and even settling the claim as the insurance policy allowed.

In the *Kemper* case, the insurer was found to be actually prejudiced as a matter of law when the insured did not give its insurer notice of a contract and tort lawsuit brought against it. *Fed. Kemper Ins. Co.*, 60 Md. App. at 294, 482 A.2d at 506. Kemper, the insurer, was not notified until after the case had been tried by a jury, the court had entered a directed verdict against the insured on one count, and the jury had found against it on two other counts. *Fed. Kemper Ins. Co.*, 60 Md. App. at 290–91, 482 A.2d at 504. The Court of Special Appeals in Kemper held that "Kemper's rights to investigate, evaluate coverage, choose defense counsel, and attempt to settle were substantial rights which were denied by the [insured's] conduct in this case which resulted in substantial actual prejudice to the [insurer]." *Fed. Kemper Ins. Co.*, 60 Md. App. at 294, 482 A.2d at 506.

Similarly, in *Local Gov't Ins. Trust*, notice of the claim was not given until after judgment was entered on the claim. That case involved a police brutality claim against Prince George's County and three Prince George's County police officers. *Local Gov't Ins. Trust*, 388 Md. at 167–68, 879 A.2d at 84–85. The Trust, the excess insurer for Prince George's County, denied coverage because the County failed to inform it of the incident, claim, and lawsuit until after the trial. The jury awarded the injured party damages of over

26

$4.1 million. The County paid the judgment. "At no point prior to the jury verdict did the County notify the Trust of the incident involving the officers and [Mr.] McCollum or of [Mr.] McCollum's suit against the County and its officers. On April 13, 2000, ten days after the jury returned its verdict, the County first wrote to the Trust, [and] informed the Trust of the judgment[.]" *Local Gov't Ins. Trust*, 388 Md. at 167–68, 879 A.2d at 84–85. This Court held that the untimely notice effectively nullified the insurer's contractual rights to "participate[ ] in trial preparation, propose[ ] trial strategies, and encourage[ ] settlement." *Local Gov't Ins. Trust*, 388 Md. at 193, 879 A.2d at 100. "Indeed, the Trust had no opportunity to participate in the investigation, settlement, or defense before the verdict was issued." *Id.* (holding that the insurer was prejudiced under the common law, rather than § 19-110 because the Trust was technically an insurance pool and, consequently, did not meet the definition of an "insurer" under § 1-101). We said, "[t]he delay vitiates the purpose of the contractual notice requirement, as the insurer cannot exercise any of its rights to investigate, defend, control, or settle the suit. Accordingly, courts have held that the insurer is prejudiced as a matter of law." *Local Gov't Ins. Trust*, 388 Md. at 190, 879 A.2d at 98.

Unlike the case at bar, in *Local Gov't Ins. Trust* and *Kemper*, the late notice resulted in actual prejudice because it eliminated the insurer's right to control or participate in litigation against its insured and to resolve the claim or employ a more effective strategy. Thus, the actual prejudice in *Local Gov't Ins. Trust* and in *Kemper* was that the late notice resulted in the impairment of *actual rights* held by the insurers with respect to the litigation. Here, National Union never had a right to participate in any part of the litigation in the ESA

27

Case because that case involved FFA acting as a plaintiff to sue Feld; FFA was not seeking defense coverage from National Union in the ESA Case. Thus, having no actual right to involvement in the ESA Case, National Union did not suffer any *actual* prejudice. Although National Union contends that in addition to appointing panel counsel, it could also have advised FFA, the harm resulting from its inability to do so is merely hypothetical. Nothing bound FFA to abide by or to even entertain National Union's advice. Moreover, National Union was aware of the RICO Case less than two months after the stay was lifted and before the merits of that case had been reached.

This Court, in *Home Indemnity Co. v. Walker*, found no actual prejudice existed in that case. 260 Md. 684, 685, 273 A.2d 429, 429 (1971). The insured notified the insurer that she was involved in an automobile accident. *Walker*, 260 Md. at 685, 273 A.2d at 429. The insurer unsuccessfully attempted to settle the case with the plaintiff's lawyer which led to the plaintiff filing suit. *Id.* During this time, the insured moved to California without notifying the plaintiff. *Walker*, 260 Md. at 686, 273 A.2d at 430. The plaintiff was eventually able to locate the insured, serve her, and obtain a default judgment. *Id.* When the plaintiff presented the default judgment to the insurer, the insurer refused to pay the money judgment and claimed actual prejudice based on "the fact that it received written notice of the filing of the suit 'after it was too late to do anything about it.'" *Walker*, 260 Md. at 687, 273 A.2d at 431. This Court held that the insured's failure to notify did not deprive the insurer of all opportunity to settle, even after default judgement. *Id.* Similarly, in the instant case, National Union had the opportunity to get involved in mediation and settlement in the RICO Case but declined. Further, we held in *Walker* that the insurer was

28

not actually prejudiced despite the plaintiff's pointing out to the insurer that they could use the default judgment as leverage in settlement negotiations. *Walker*, 260 Md. at 687, 273 A.2d at 430 (The comment "I am sure you would like time to re-examine your file, etc. and possibly to increase your offer for an out-of-court settlement" was stated by the plaintiffs in a letter to the insurer.). Here, there is an even weaker argument for finding actual prejudice as Feld never suggested or took the position that the findings from the ESA Case had increased the settlement value of the RICO Case.

In *Allstate*, this Court held that the automobile liability insurer was actually prejudiced when the insured breached the cooperation clause of the insurance policy by refusing to attend depositions, respond to interrogatories and demands for documents, and attend trial. *Allstate Ins. Co.*, 363 Md. at 128, 767 A.2d at 843. The insured's actions precluded the insurer from presenting evidence that the insured was driving at a normal speed, concerned about ice, and had hazard lights on at the time of the accident. *Allstate Ins. Co.*, 363 Md. at 129, 767 A.2d at 844. If this evidence had been presented a jury could have reasonably found no negligence by the insured in the operation of the vehicle. *Allstate Ins. Co.*, 363 Md. at 116, 767 A.2d at 837.

> The prejudice was not in terms of how the jury would actually have viewed this evidence, whether the jury would have found it believable or not believable, for that is purely a matter of speculation. The prejudice lies in the fact that there was a credible defense to be presented and that Kirby's non-cooperation precluded State Farm from even presenting that defense.

*Allstate Ins. Co.*, 363 Md. at 129–30, 767 A.2d at 844. Though there was also a breach of the insurance contract when FFA did not provide timely notice, unlike in *Allstate*, there was no lost opportunity to present evidence resulting in actual prejudice to National Union.

29

Although the findings in the ESA Case would naturally affect the outcome in the RICO Case because they would establish a violation of the RICO Act and constitute mail and wire fraud, National Union was not affected in its right to investigate, settle, or defend the RICO claim. This is so because National Union could not have intervened in, impacted, or influenced the outcome of the ESA Case. The ESA Case was a completely separate action, which did not involve National Union. National Union had no duty to defend where its insured was suing another party. National Union only had the right to be involved in the RICO Case, as that case involved its insured, FFA, defending claims brought against it. Moreover, National Union was notified shortly after the stay was lifted in the RICO Case, before mediation, settlement or a trial in the RICO Case had taken place.

Maryland law requires proof of actual prejudice to avoid policy holder forfeiture and insurance company windfall. *Local Gov't Ins. Trust*, 388 Md. at 185–86, 879 A.2d at 95. The lack of a connection or link between the alleged actual prejudice and delayed notice, and the notion that an insurer can hang its disclaimer on any developments that occurred before notice was given, regardless of whether the earlier notice would have made a difference in the outcome of the case, is inconsistent with § 19-110.

We hold that an insurer must show, by a preponderance of the evidence, that the insured's delay in giving notice resulted in actual prejudice to the insurer in order to disclaim coverage under § 19-110. National Union could not show, by a preponderance of the evidence, that the late notice resulted in actual prejudice in order to disclaim coverage. National Union argued it was actually prejudiced because it believed FFA was precluded in the RICO Case from contesting many of the facts found by the court in the ESA Case,

30

as those facts undermined any defense FFA might have raised. Although FFA's defense in the RICO Case *may* have been hindered by the adverse findings from the ESA Case, this alleged prejudice was not attributable to the late notice FFA gave to National Union concerning the RICO Case. The ESA case did not involve National Union and it could not have intervened in, impacted, or affected the ESA findings. Prejudice in the form of National Union's inability to do anything it might have done had it received earlier notice is entirely speculative. Moreover, National Union's inability to participate in the ESA Case was not the result of *late notice*, but rather, was the result of lacking any *right* to participate in the case. Further, National Union was informed by FFA of the RICO Case almost immediately after the stay in the RICO Case was lifted and before mediation, settlement, or the merits of the case had been reached. Therefore, National Union was not prejudiced in investigating, settling, or defending the RICO Case as a result of it receiving late notice.

**Collateral Estoppel**

"The doctrine of collateral estoppel precludes a party from re-litigating a factual issue that was essential to a valid and final judgment against the same party in a prior action." *Shader v. Hampton Improvement Ass'n, Inc.*, 217 Md. App. 581, 605, 94 A.3d 224, 238 (citing *Welsh v. Gerber Prods., Inc.*, 315 Md. 510, 516, 555 A.2d 486 (1989)), *cert. granted*, 440 Md. 225, 101 A.3d 1063 (2014), *aff'd*, 443 Md. 148, 115 A.3d 185 (2015). There is a four-part test under Maryland law which must be satisfied for collateral estoppel to apply.

1. Was the issue decided in the prior adjudication identical with the one presented in the action in question?
2. Was there a final judgment on the merits?

31

3. Was the party against whom the plea is asserted a party or in privity with a party to the prior adjudication?
4. Was the party against whom the plea is asserted given a fair opportunity to be heard on the issue?

*Wash. Suburban Sanitary Comm'n v. TKU Assocs.*, 281 Md. 1, 18–19, 376 A.2d 505, 514 (1977) (citing *Pat Perusse Realty Co. v. Lingo*, 249 Md. 33, 39, 238 A.2d 100, 104 (1968)).

In addition, collateral estoppel as a defense to a claim is an affirmative defense and must be raised in a party's answer. Md. Rule 2-323(g)(4). The defense is waived if it is not raised properly. Md. Rule 2-323(a). The Court of Special Appeals agreed with National Union that FFA's waiver argument, that National Union did not specifically raise collateral estoppel as a defense in the Coverage Case, was meritless. National Union's defense to the breach of the insurance contract claim was that it could disclaim coverage due to actual prejudice resulting from FFA's breach of the 2007 Policy by providing late notice of the RICO Case. National Union claimed that by the time it had notice of the RICO Case, in 2010, Judge Sullivan had already made findings of fact detrimental to FFA in the ESA Case. And, moreover, National Union contends, in the RICO Case, Feld could have raised collateral estoppel offensively to preclude FFA from contesting the court's factual findings. Therefore, according to National Union, it was not defending the breach of the insurance contract claim against it on the ground of collateral estoppel, rather it was asserting actual prejudice. National Union pointed out that Feld could have asserted the doctrine of collateral estoppel in the RICO Case and that would have prejudiced FFA's defense and therefore ultimately prejudiced National Union. National Union contends it was not required to plead collateral estoppel as an affirmative defense in its answer in the

32

Coverage Case because it was not raising the doctrine as a defense, rather it was asserting the doctrine to demonstrate actual prejudice.

The Circuit Court found that Judge Sullivan, in the RICO Case, would have likely precluded FFA from re-litigating factual findings made in the ESA Case. The findings in the ESA Case were that "Rider [was] essentially a paid plaintiff[,]" the organizational plaintiffs used the United States mail system to make payments, and the payments "were not disclosed initially in discovery, by both omissions and affirmatively false statements." *Feld Entm't, Inc.*, 677 F. Supp. 2d at 67, 77, 83. Further, the Circuit Court reasoned that findings in the ESA Case were related to the same issues that formed the basis for Feld's RICO, conspiracy, abuse of process, and malicious prosecution claims; hence, the issues were fully litigated. The court noted that Judge Sullivan made findings regarding those issues (which he knew overlapped issues pending in the RICO Case). In addition, the Circuit Court noted that FFA had the opportunity and did contest those issues, thus, it would conserve judicial resources to preclude relitigation of identical factual issues.

In our view, under the collateral estoppel doctrine, in the RICO Case, FFA could have been precluded from contesting those same prejudicial facts and would have been bound by them. Moreover, those facts could have been significantly detrimental to FFA's defense in the RICO Case. Alternatively, even if collateral estoppel did not apply and the factual findings in the ESA Case were not binding on FFA in the RICO Case, as the Circuit Court pointed out, the findings had the potential to create prejudice in terms of evaluating the settlement of the RICO Case and could drive up the settlement value.

33

Assuming *arguendo* that collateral estoppel would have prejudiced the RICO Case due to the adverse factual findings made in the ESA Case—that FFA paid Mr. Rider for testimony, concealed those payments, and used the United States mail system—it could certainly have hindered FFA's defense in the RICO Case or driven up the amount of the settlement demand. However, as we discussed, National Union could not establish in the Coverage Case that *late notice* of the claims resulted in *actual* prejudice because National Union had no right to involvement in the ESA Case. At best, National Union could have "monitored" that case.

### Instruction on Remand

The Court of Special Appeals noted that if FFA had moved for judgment in the Coverage Case, the court would have directed the Circuit Court to enter judgment in favor of FFA on liability. Further, if FFA did move for judgment on remand the trial court should enter judgment in FFA's favor; however, the determination of damages was not before the intermediate appellate court and that issue would have to be decided on remand. We hold that the Court of Special Appeals did not exceed its authority and abuse its discretion, by instructing the trial court on remand to permit the filing and granting of a belated motion for judgment, even though such a motion was never filed at the time of trial. *Ray v. State*, 206 Md. App. 309, 337 n.13, 47 A.3d 1113, 1128 n.13 (2012), *aff'd*, 435 Md. 1, 76 A.3d 1143 (2013) (to be preserved, "an issue simply needs to be 'raised in or decided by the trial court,' regardless of which party raises the issue"); Md. Rule 2-501(f) (noting that the court "shall enter judgment in favor of or against the moving party"). National Union could not

have satisfied its burden under § 19-110 and therefore judgment should not have been granted in its favor.

In addition, Md. Rule 8-131(a) grants the appellate courts of this State discretion to review any unpreserved issue. *Jones*, 379 Md. at 715, 843 A.2d at 784–85. The Court of Special Appeal's decision to consider an "unpreserved issue" is reviewed under a deferential abuse of discretion standard. *Jones*, 379 Md. 704, 715, 713, 843 A.2d 778, 785, 783 (2004) ("[A]n appellate court has discretion to excuse a waiver or procedural default and to consider an issue even though it was not properly raised or preserved by a party"). We hold that it was proper for the Court of Special Appeals to direct the Circuit Court to enter judgment in favor of FFA.

## CONCLUSION

For the reasons stated above, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IS AFFIRMED. COSTS TO BE PAID BY PETITIONER.**