REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2013

September Term, 2015

_____

HARTFORD FIRE INSURANCE COMPANY

v.

ESTATE OF ROBERT L. SANDERS

_____

Eyler, Deborah S.,
Kehoe,
Shaw Geter,

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed:  March 2, 2017

This estate case is in the unusual posture of being on its third level of court review. Hartford Fire Insurance Company ("Hartford"), the appellant, is the surety on a $20,000 personal representative bond obtained by Vanessa Sims, the former personal representative of the Estate of Robert L. Sanders ("Estate"), the appellee. In a proceeding to which Hartford was not on notice, the Orphans' Court for Baltimore City entered an order finding that Sims had misappropriated $13,566.23 in Estate assets. When Sims failed to repay the Estate, Charleen Price, the present personal representative of the Estate, brought an action against the bond in that court. After a hearing in which Hartford participated, the orphans' court entered an order condemning the bond for $13,566.23.

Hartford appealed the orphans' court's judgment to the Circuit Court for Baltimore City. In a trial *de novo*, the court entered judgment condemning the bond for $3,256.96. The Estate obtained review of that judgment by a three-judge in banc panel of the circuit. The in banc court reversed the trial court and entered judgment against Hartford, condemning the bond for $13,566.23. After the in banc court denied a motion to alter or amend, Hartford noted this appeal.

## FACTS AND PROCEEDINGS

### Orphans' Court Proceedings

On October 28, 2002, Robert L. Sanders died without a will. He had been a plaintiff in ongoing asbestos-related litigation that continued after his death. Princess Sanders, his infant daughter, was his sole heir. Charleen Price is Princess's mother.

Price opened a small estate to receive settlement payments in the asbestos-related litigation, which were expected to be made periodically for some time into the future.[1] On April 14, 2003, the Orphans' Court for Baltimore City appointed Price and Vanessa Sims, Sanders's sister, co-personal representatives of the Estate. The Law Firm of Peter T. Angelos ("Angelos Firm") represented Sanders and, after his death, the Estate.

Eight years went by. On March 18, 2011, Sims filed a petition to remove Price as co-personal representative. By order of May 9, 2011, the orphans' court granted the petition and named Sims as the sole personal representative of the Estate. The record does not reveal the basis for Price's removal.

On March 18, 2013, at the suggestion of the Angelos Firm, Sims obtained from Hartford the $20,000 personal representative's bond central to this case. The bond was filed with the register of wills on March 20, 2013. Five months later, on August 28, 2013, the Angelos Firm filed a motion in the orphans' court to withdraw its appearance for the Estate. In support, it asserted that, on July 12, 2012, Sims had misappropriated $2,500 from the Estate and since then had repeatedly refused to return the funds to the Estate. The orphans' court granted the motion on September 3, 2013. Three days later, on September 6, 2013, Price filed a petition to remove Sims as personal representative.

---

[1] When the Estate was opened, an estate having a value of $30,000 or less as of the date of the decedent's death could be administered as a small estate. Md. Code (1974, 2001 Repl. Vol.), § 5-601 of the Estates and Trusts Article ("ET"). Small estates are governed by ET sections 5-601 through 5-607. However, "[e]xcept to the extent inconsistent with the letter and spirit of [the small estate] subtitle, all other provisions of the estates of decedents law shall be applicable to a small estate." ET § 5-607.

Apparently with Sims's consent, the orphans' court issued an order on January 8, 2014, docketed the next day, removing her as personal representative and appointing Price as successor personal representative ("January 2014 Order"). The January 2014 Order stated that Sims "shall turn over to the Successor Personal Representative [Price], within five (5) days of the date of this order, all known assets, property, and records pertaining to [the] [E]state." Sims did not do so.

On May 22, 2014, Price filed a petition for the return of the Estate assets allegedly misappropriated by Sims. The orphans' court issued a show cause order directing Sims to appear on July 21, 2014, to account for the missing Estate funds. Hartford was not notified of the petition or the show cause order.

At the July 21, 2014 hearing, the court received evidence and found that Sims had misappropriated $13,566.23 from the Estate. It authorized Price to bring an action against the bond if Sims did not pay that sum to the Estate within 30 days. These rulings were memorialized in an order entered on July 28, 2014 ("the July 2014 Order"). Sims filed a timely motion for reconsideration, which was denied. She did not pay $13,566.23 to the Estate within the 30-day timeframe, or at all, and did not appeal the July 2014 Order.

On August 25, 2014, Price filed a petition to condemn the bond. Two days later, the orphans' court issued an order directing Hartford to show cause in writing why the petition should not be granted. The order was served on counsel for Hartford. Hartford responded and an evidentiary hearing on the petition to condemn the bond was scheduled and went forward on November 3, 2014. On November 10, 2014, the orphans' court

entered an order finding that Sims had "misappropriated estate funds as stated in this Court's [July 2014 Order]"; condemning the bond for $13,566.23; authorizing Price to recover that sum from Hartford as surety; and entering judgment in favor of Hartford against Sims for that sum ("November 2014 Order").

### Appeal of Orphans' Court's November 2014 Order to Circuit Court for Baltimore City

Under section 12-502 of the Courts and Judicial Proceedings Article, Md. Code (1973, 2013 Repl. Vol.) ("CJP"), a final judgment of the orphans' court may be appealed to the circuit court.[2] Such an appeal "shall be heard *de novo* by the circuit court[,]" CJP section 12-502(a)(1)(ii), and "shall be treated as if it were a new proceeding and as if there had never been a prior hearing or judgment by the orphans' court." *Id.* at § 12-502(a)(1)(iii). "The circuit court shall give judgment according to the equity of the matter." *Id.* at § 12-502(a)(1)(iv). To take an appeal to the circuit court, an "order for appeal" must be filed with the register of wills "within 30 days after the date of the final judgment [of the orphans' court] from which the appeal is taken." *Id.* at § 12-502(b)(1).

On November 20, 2014, Hartford noted a timely appeal of the orphans' court's November 2014 Order to the Circuit Court for Baltimore City. The circuit court held a trial *de novo* on January 27, 2015. The Estate took the position that the bond should be

---

[2] An appeal to the circuit court is not permitted in Harford or Montgomery Counties, where the circuit court sits as the orphans' court. An alternative avenue to an appeal to the circuit court exists under CJP section 12-501, which permits a final judgment of the orphans' court to be appealed directly to this Court, from any orphans' court.

condemned for the full $13,566.23 misappropriated by Sims. Hartford took the position that the bond only could be condemned for sums misappropriated by Sims after the March 18, 2013 date of the bond and before Sims was removed as personal representative, and those sums were less than $13,566.23.

Without objection, the Estate moved into evidence copies of the orphans' court's May 9, 2011 Order removing Price as personal representative; the bond; the orphans' court's January 2014 Order removing Sims as personal representative; and the orphans' court's July 2014 Order finding that Sims had misappropriated $13,566.23 in assets from the Estate. It also introduced a spreadsheet, to which the parties had stipulated, showing the asbestos-related litigation payments made to the personal representative(s) of the Estate from March 29, 2004, to February 26, 2014. The gross settlements totaled $33,794, but after attorneys' fees and litigation costs were deducted, the net payments received by the Estate came to $22,106.20.[3] The spreadsheet reflected that from March 18, 2013 (the date of the bond) to January 8, 2014 (the date Sims was removed as personal representative), three asbestos-related litigation net payments were made to Sims as personal representative: 1) $2,847.50, on June 10, 2013; 2) $237.93, on August 7, 2013; and 3) $171.53, on November 18, 2013.

Hartford called Sims as a witness. She identified a check she signed on July 19, 2013, for $2,847.50, on the Estate's bank account, payable to "Charleen Price for

_____

[3] There is nothing in the record to suggest that the Estate ever received any income other than the asbestos-related litigation payments.

Princess Sanders, minor." ("July 2013 Check"). The "memo" line on the check reads "Pfizer Global Settlement Dist." The check is attached to an August 5, 2013 letter to Price from counsel with the Angelos Firm, stating that it "represents a distribution to [Princess] as the sole heir of" the Estate. The July 2013 Check with attached letter was moved into evidence without objection, and Sims then was asked, in vague terms, whether there also were checks written for $237 and $171 during the period from March 18, 2013, until January 8, 2014. She responded yes. (No such checks were produced or offered into evidence.)

On cross-examination, Sims was shown a document entitled "6th Supplemental Schedule – B" that was filed in the orphans' court on March 19, 2013. She acknowledged that she signed the document on March 5, 2013. In Paragraph 1, the document reports that the Estate has "Total Gross Assets" of $25,250.97, comprised of $10,971.72 in "Assets previously reported" and $14,279.25 in "Partial asbestos-related assets[.]" An attached addendum breaks down the "Partial Asbestos Related Settlements" by date and amount received, from November 2009 to December 2012.

In closing argument, the Estate's lawyer asserted that 1) the July 2014 Order of the orphans' court, establishing that Sims misappropriated $13,566.23 from the Estate, was a final judgment that was not timely challenged on appeal; 2) only the orphans' court's November 2014 Order condemning the bond for $13,566.23 was timely appealed and before the circuit court in the trial *de novo*; and 3) the sole issue in the appeal from the November 2014 Order—the amount for which the bond would be condemned—was conclusively determined by the July 2014 Order. Therefore, the correct outcome was an

affirmance of the orphans' court's November 2014 Order condemning the bond for $13,566.23.

Hartford's lawyer responded that the bond only could be condemned for the amount misappropriated by Sims between the date of the bond and the date she was removed as personal representative; and that, according to Sims's testimony, she wrote three checks on the Estate's account during that time—for $2,847.50, $237.93, and $171.53—totaling $3,256.96. He maintained that there was no evidence that those sums were misappropriated at all, but if they were, they were the maximum amount for which the bond could be condemned. Therefore, the correct outcome was a reversal of the orphans' court's November 2014 Order and a judgment completely in favor of Hartford or a judgment condemning the bond for $3,256.96 at most.

In rebuttal, counsel for the Estate argued that the $20,000 penalty sum for the bond covered all the funds that should have been in the Estate when Sims was personal representative, not just the funds she misappropriated after the date of the bond and before she was removed as personal representative.

After closing arguments, the trial judge announced that because the appeal was *de novo*, she would not accept the orphans' court's July 2014 Order as proof that Sims had misappropriated $13,566.23 from the Estate. She stated that she "really [did not] know" how the orphans' court had arrived at that number, and it was the Estate's burden to produce evidence to show that Sims had misappropriated that amount from the Estate. At that point, counsel for the Estate sought to move into evidence "the numbers that [he] submitted" in the orphans' court to support the $13,566.23 misappropriation figure.

Counsel for Hartford objected to any additional evidence being taken, because the parties had rested and closing arguments were finished. The objection was sustained.

The trial judge proceeded to make findings on the amount of Estate funds, if any, the Estate had proven Sims had misappropriated. After commenting that she had reviewed the exhibits, she recounted what had ensued in the orphans' court, as shown in the record of that court underlying the November 2014 Order. She took note of the Angelos Firm's August 29, 2013 motion to strike appearance on the ground that Sims had taken $2,500 from the Estate checking account for her own use on July 12, 2012, and the firm's unsuccessful efforts to have her repay the Estate; and that the motion had been granted on September 3, 2013. The judge further recited that in Price's petition to return Estate funds, she alleged that on January 10, 2014, Sims had withdrawn $2,847.50 from the Estate checking account without permission and for her own use.[4]

The trial judge found that the spreadsheet showed that the asbestos-related litigation payments to the Estate totaled $33,794.[5] She further found that the spreadsheet showed a "check[] written" for $2,847.50 while Sims was the sole personal representative of the Estate; and that the July 2013 Check was written for "the exact same amount."

_____

[4] In fact, in her petition, Price alleged that Sims had "repeatedly withdrew [sic] funds from Estate account without permission from the Court. On January 10, 2014, Ms. Sims withdrew the remaining funds from Estate checking account after being removed as personal representative." The petition did not mention a $2,847.50 amount.

[5] As noted above, that was the gross amount, before payment of attorneys' fees and expenses.

The judge stated that she did not see "any check or the reasons why there was 237.93 for August 7th, 2013" and that "there was a check in the amount of 171.53, that was November 18th, 2013." The judge could not tell "why [those checks] were written."

Concluding, the trial judge determined:

[T]here's been no testimony in evidence how, through this accounting,[6] from the period of March 18, 2013 to January 8, 2014, there's no evidence that supports that Ms. Sims specifically misappropriated Estate funds of 13,566.23.

Rather, the total amount that I see is 2,847.50, plus 237.93, plus 171.53 equals 3,256.96. That is the total amount that, based on the testimony and the evidence, this Court can find that Ms. Sims misappropriated while she was the Personal Representative of the Estate of Robert L. Sanders, between March 18, 2013 to January 8, 2014.

Thus, the trial judge ruled that the relevant time period for determining whether the bond would be condemned was from March 18, 2013, to January 8, 2014, and the only evidence before the court was that Sims misappropriated $3,256.96 during that time. On those bases the court entered an order condemning the bond for $3,256.96.

## Review By In Banc Panel of the Circuit

After the trial court entered its order, the Estate filed a timely notice for in banc review by a three-judge panel of the circuit. The parties filed memoranda, and the in banc court held a hearing on June 16, 2015. On September 16, 2015, it docketed a memorandum opinion and order reversing the trial court's judgment and condemning the bond for $13,566.23.

---

[6] The judge at times referred to the spreadsheet as an "accounting."

The in banc court reasoned that the July 2014 Order was a "final judgment" of the orphans' court that was not appealed and consequently was a conclusive determination, binding on Hartford in the action against the bond, that Sims had misappropriated $13,566.23 from the Estate. The *de novo* appeal to the circuit court, being taken from the orphans' court's November 2014 Order condemning the bond for $13,566.23, only concerned the amount for which the bond would be condemned, not whether Sims had misappropriated funds from the Estate. The Estate was not required to prove in the *de novo* appeal that Sims had misappropriated funds from the Estate. Moreover, the bond applied retroactively, under *Brown v. Murdock*, 16 Md. 521 (1861), and properly was condemned for the entire $13,566.23 misappropriated by Sims regardless of whether some of the Estate funds were misappropriated before the date of the bond. Although not dispositive, but relevant to our analysis *infra*, the in banc court concluded that the Estate had waived its alternative argument that Hartford was liable on the bond for the full amount misappropriated by Sims, including misappropriations that predated the bond, because Sims failed to turn over the funds that should have been in the Estate when she was removed as personal representative.

On September 24, 2015, Hartford filed a motion to alter or amend the judgment of the in banc court, citing Rule 2-534. It argued that the in banc court had erred as a matter of law in holding that the bond could apply retroactively to misappropriations pre-dating the March 18, 2013 date of the bond and asked that the in banc court revise its judgment accordingly. On October 6, 2015, the Estate filed an opposition. On October 22, 2015,

-10-

the in banc panel entered an order, docketed four days later, denying Hartford's motion. Hartford noted this appeal on November 17, 2015.

## STANDARD OF REVIEW AND QUESTIONS PRESENTED

As explained, an appeal to the circuit court from a final judgment of the orphans' court is *de novo*. So here, the January 27, 2015 trial in the circuit court was a substitute for the November 3, 2014 evidentiary hearing in the orphans' court that resulted in the November 2014 Order.

Article IV, section 22 of the Maryland Constitution, as implemented in civil cases by Rule 2-551, grants a party against whom a decision was made by the circuit court a right to in banc review by a three-judge panel of the circuit.[7]   The in banc court

---

[7] Article IV, section 22, entitled "Reservation of points or questions for consideration by court in banc," states:

> Where any trial is conducted by less than three Circuit Judges, upon the decision or determination of any point, or question, by the Court, it shall be competent to the party, against whom the ruling or decision is made, upon motion, to have the point, or question reserved for the consideration of three Judges of the Circuit, who shall constitute a court in banc for such purpose, and the motion for such reservation shall be entered of record, during the sitting at which such decision may be made; and the procedure for appeals to the Circuit Court in banc shall be as provided in the Maryland Rules. The decision of the said Court in banc shall be the effective decision in the premises, and conclusive, as against the party at whose motion said points, or questions were reserved; but such decision in banc shall not preclude the right of Appeal by an adverse party who did not seek in banc review, in those cases, civil or criminal, in which appeal to the Court of Special Appeals may be allowed by Law. The right of having questions reserved shall not, however, apply to trials of Appeals from judgments of the District Court, nor to criminal cases below the grade of felony, except when the punishment is confinement in the Penitentiary; and

(Continued…)

"functions 'as a separate appellate tribunal[.]'" *Bienkowski v. Brooks*, 386 Md. 516, 553 (2005) (quoting *Board v. Haberlin*, 320 Md. 399, 406 (1990)). For the party seeking it, in banc review serves as a substitute for an appeal to this Court. *Haberlin,* 320 Md. at 406. For that reason, the role of the in banc court is not to reconsider the decision of the trial court. *Dabrowski v. Dondalski*, 320 Md. 392, 396 (1990). Instead, it is to engage in appellate review of the trial court's decision. *Azar v. Adams*, 117 Md. App. 426, 429 (1997) ("[T]he *in banc* panel sits to review the findings of the trial court and, as such, sits in an appellate capacity.").

A party who seeks and obtains in banc review "has no further right of appeal." Md. Rule 2-551(h). That does not preclude another party from taking an appeal to this Court, however. Specifically, a party who did not seek and obtain in banc review may appeal from the judgment of the in banc court, to the extent the judgment otherwise is appealable. *Id.*

In the case at bar, the Estate lost Hartford's *de novo* appeal to the trial court; sought and obtained in banc review of the trial court's judgment; and prevailed before the in banc court, which reversed the trial court's judgment. If the Estate had not prevailed before the in banc court, its right to appeal to this Court would have been foreclosed. Hartford, which had prevailed before the trial court in the *de novo* appeal, did not seek

---

(…continued)
       this Section shall be subject to such provisions as may hereafter be made by
       Law.

and obtain in banc review and, having lost before the in banc panel, could note a further appeal to this Court.

The questions Hartford presents in this appeal are phrased in terms of our reviewing the judgment of the in banc court and, more particularly, the decisions underlying that judgment, as opposed to the judgment of the trial court. Before addressing the questions, we must ascertain our standard of review and determine from that whether the questions should be rephrased to focus on the rulings by the trial court as opposed to the decision of the in banc court.

As an appellate tribunal, the in banc court "is subordinate to this Court just as we are subordinate to the Court of Appeals." *Azar*, 117 Md. App. at 433. *See also Langston v. Langston*, 136 Md. App. 203, 221 (2000) (stating "[i]f the in banc panel functions like an intermediate appellate court, then our role is akin to the Court of Appeals, in the sense that we provide an additional level of appellate review"), *aff'd on other grounds*, *Langston v. Langston*, 366 Md. 490 (2001). Thus, it is helpful to examine the reviewing roles of this Court and the Court of Appeals in a case that comes before the former and then the latter on the same issue.

The "scope of review" for both Maryland appellate courts, set forth in Rule 8-131, is identical, with the exception of certain limitations the Court of Appeals imposes upon itself by virtue of the issues on which it grants certiorari. *See* Md. Rule 8-131(b). For an action tried without a jury, "the appellate court," that is, either the Court of Appeals or this Court, "will review the case on both the law and the evidence" and "will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due

-13-

regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131(c). In other words, ordinarily, whether this Court is reviewing a ruling that comes before us on appeal from the trial court, or the Court of Appeals is reviewing the same ruling that comes to it on a grant of a petition for certiorari, after review by this Court, ultimately it is the judgment of the trial court that is under review.

Consistent with this concept, the same standards of review apply to appeals in both courts. When a pure question of law comes before either this Court or the Court of Appeals, the standard of review is *de novo*, that is, neither Court gives any deference to the trial court's interpretation of the law. *See Nesbit v. Gov't Emps. Ins. Co.*, 382 Md. 65, 72 (2004); *Walter v. Gunter*, 367 Md. 386, 392 (2002). This means, necessarily, that when the Court of Appeals grants certiorari to review a legal issue decided by the circuit court and addressed by this Court on appeal, it will not defer to this Court's decision. To be sure, the Court of Appeals may consider our reasoning and explain why it agrees or disagrees with it; and its mandate will affirm, reverse, or otherwise dispose of this Court's judgment. But ordinarily its decision will come down to whether the trial court's ruling was legally correct.

Likewise, when this Court has decided whether a factual finding by a trial court was or was not clearly erroneous, our decision will not be entitled to deference on further review by the Court of Appeals, because our decision is itself a legal ruling. Appellate courts do not make factual findings or substitute the factual findings they would rather the trial court have made for the non-clearly erroneous factual findings that were made. In other words, we are not making findings of fact but are making a legal assessment as

-14-

to whether the trial court's factual finding satisfies the clearly erroneous standard of appellate review. *See* Md. Rule 8-131(c); *Agency Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 193 Md. App. 666, 671–72 (2010); *Thomas v. Capital Mgmt. Assocs., LLC*, 189 Md. App. 439, 453 (2009). A decision by this Court that a trial court's factual finding was or was not supported by competent and material evidence in the record does not constrain the Court of Appeals upon further review of that issue. The Court of Appeals decides for itself whether the trial court's factual finding was clearly erroneous, without deference to our decision on the same issue.

When this Court reviews a trial court's exercise of discretion, our standard is abuse of discretion, which is highly deferential *to the trial court* that is the judicial body that exercised its discretion. *Goodman v. Commercial Credit Corp.*, 364 Md. 483, 491–92 (2001) ("Where the decision or order of the trial court is a matter of discretion it will not be disturbed on a review except on a clear showing of abuse of discretion[.]") (internal quotations omitted). Our holding either way—that the trial court did or did not abuse its discretion—does not circumscribe the Court of Appeals's analysis of the same issue on further review. The Court of Appeals owes the same deference *to the trial court* that the standard of review requires, but does not owe deference to our decision on the issue. In such a review, neither this Court nor the Court of Appeals is exercising discretion; we are deciding the essentially legal question whether the trial court improperly exercised its own discretion.

Of course, sometimes issues arise on appeal that emanate from this Court to begin with and that will be decided by the Court of Appeals on further review without reference

to a decision of the trial court. For example, if we were to dismiss an appeal for lack of an appealable order, the Court of Appeals on further review would be assessing our decision, not a decision by the trial court. Likewise, if we were to decide upon vacating a judgment that a limited remand was the proper disposition, the Court of Appeals on further review would be assessing our decision about that disposition, which obviously originated with us, not with the trial court.

The Court of Appeals's recent decision in *Nat'l Fire Ins. Co. of Pittsburg, PA v. Fund for Animals, Inc.,* No. 18, September Term, 2016 (filed January 27, 2017), is illustrative. In *Fund for Animals, Inc. v. Nat'l Fire Ins. Co. of Pittsburg, PA,* 226 Md. App. 644 (2016), we held that, under the applicable statute, for an insurer to disclaim coverage based on a delay in giving notice, the insurer must show that the delay caused it to suffer actual prejudice; and the insurer did not adduce evidence at trial to make that showing. We vacated the judgment of the trial court and remanded with an instruction to enter judgment in favor of the insured, should it move for summary judgment on remand, and even though it had not moved for judgment at trial. The Court of Appeals granted certiorari to decide whether the statute indeed requires a showing of actual prejudice caused by the delay in notice and whether we exceeded our authority and/or abused our discretion by disposing of the appeal in that fashion. The Court of Appeals reviewed the first question without deference to our legal analysis, although it agreed with it. The Court reviewed *our remand decision* directly, analyzing whether our disposition was an abuse of our discretion or an act that exceeded our authority, and holding that it was neither.

With this in mind, we shall examine and reframe as necessary the questions Hartford presents on appeal. In its first two questions, Hartford asks:

> Whether the in banc court erred in holding that [the July 2014] order of the orphans' court was final, notwithstanding the fact that it did not finally dispose [of the] orphans' court's matters, and notwithstanding the fact that the order did not address or resolve the claim against Hartford.

> Whether the in banc court erred in holding that upon appeal of the final order of an orphans' court [to the circuit court,] the circuit court is precluded from litigating the antecedent orders passed within the orphans' court.

The essence of these questions is whether the trial court erred in ruling that, in the action to condemn the bond, the July 2014 Order of the orphans' court could not serve as evidence that Sims misappropriated $13,566.23 from the Estate, thus requiring the Estate to produce evidence to prove that fact. As explained, the in banc court rejected that ruling on the ground that the July 2014 Order was not appealed and therefore conclusively bound Hartford in the action to condemn the bond. We shall rephrase these questions as:

> I. Did the trial court err in ruling that it could not accept the orphans' court's July 2014 Order as evidence that Sims misappropriated $13,566.23 from the Estate?

In discussing this question, we shall consider the in banc court's reasoning that the July 2014 Order was binding on the trial court in the *de novo* appeal of the action against the bond, and the trial court's reasoning that that order was not binding and indeed could not even be considered by it as evidence.

Hartford's next two questions are:

Whether the in banc court erred in failing to hold that the circuit court's handling of the appeal was correct, so that factual findings of the trial court should have been upheld, where there was no basis for a determination of error on the trial court's findings of fact.

Whether the in banc court erred in holding that a personal representative's bond is retroactive, applying to alleged misconduct having taken place prior to issuance of the bond.

These questions boil down to whether the trial court erred in ruling that the bond only could be condemned for sums misappropriated after the date of the bond and that $3,256.96 was misappropriated during that period. We shall rephrase them as:

II.     Did the trial court err in ruling that the bond only could be condemned for $3,256.96?

Again, in analyzing the question we shall discuss the reasoning of the trial court and of the in banc court.

Finally, Hartford's last question presented is:

Whether the in banc court erred in denying the [R]ule 2-534 motion to alter or amend, by failing to exercise discretion, which such discretion would have indicated amendment of the panel's findings; such of Hartford's motion having relied upon assignments of error [as set forth in the previous questions presented].

We shall rephrase this unfortunately convoluted question as:

III.    Did the in banc court abuse its discretion by denying Hartford's motion to alter or amend?

For the reasons we shall explain, we conclude that the trial court committed reversible error. We shall affirm the judgment of the in banc court condemning the bond for $13,566.23, although for reasons different than those expressed by the in banc panel.

DISCUSSION

**I.**

**Did the Trial Court Err in Ruling that in the De Novo Appeal from the
Orphans' Court's November 2014 Order in the Action on the Bond it
could not accept the Orphans' Court's July 2014 Order as Evidence
that Sims Misappropriated $13,566.23 from the Estate?**

This issue concerns the effect, if any, of the July 2014 Order, in which the

orphans' court found that Sims misappropriated $13,566.23 from the Estate, on the *de*

*novo* appeal to the circuit court from the orphans' court's November 2014 Order

condemning the bond for that amount. As mentioned, in the *de novo* appeal, the trial

court ruled that to succeed in having the bond condemned for $13,566.23, the Estate had

to produce evidence that Sims misappropriated that sum from the Estate; and the July

2014 Order could not satisfy that burden of production. In its case in the *de novo* trial,

the Estate's only evidence of the misappropriation was the July 2014 Order. In its case,

Hartford introduced evidence that, to the extent any funds were misappropriated, only

$3,256.96 was misappropriated after the date of the bond. The trial court relied on

Hartford's evidence to find that the bond would be condemned for $3,256.96.

The Estate contends the trial court's ruling about the July 2014 Order was legally

incorrect. Adopting the reasoning of the in banc court, it argues that that order was a

final judgment of the orphans' court deciding that Sims misappropriated $13,566.23 from

the Estate; and because Hartford did not appeal that order, it was bound by it in the action

on the bond in the orphans' court and in the *de novo* appeal from the orphans' court's

November 2014 Order. Because the July 2014 Order established that Sims

misappropriated $13,566.23 from the Estate, and Hartford was bound by that finding, it (the Estate) was not required to prove, in the *de novo* appeal, that Sims had misappropriated that amount from the Estate.

Hartford contends the trial court correctly ruled that because the appeal from the orphans' court's November 2014 Order condemning the bond for $13,566.23 was *de novo*, the Estate was required to prove that Sims in fact misappropriated money from the Estate, the amount misappropriated, and when it was misappropriated; and that the Estate had not done so. In Hartford's view, contrary to the reasoning of the in banc court, the July 2014 Order "did not adjudicate claims" against it because it was not on notice of Price's petition for the return of the Estate funds allegedly misappropriated by Sims or the proceeding on that petition that culminated in the July 2014 Order. Therefore, in the *de novo* appeal, the July 2014 Order was not binding on it.

These contentions rest on questions of law, which we review *de novo*. *Griffin v. Lindsey*, 444 Md. 278, 285 (2015) ("We review questions of law without deference [to the lower court].). As we shall explain, we disagree with both contentions and with the analyses by the in banc court and by the trial court of the effect, or lack of effect, of the July 2014 Order in the *de novo* appeal from the November 2014 Order.

For over 100 years it has been well-settled in Maryland that in an action against a surety on a bond, a prior determination of liability against the principal for breach of a duty covered by the bond is at least "prima facie binding" on the surety. In *Grafflin v. State*, 103 Md. 171 (1906), Chief Judge McSherry summarized what that means:

> [A] recovery against a principal in a bond, *even though the sureties are not parties to the suit* is prima facie binding on the sureties, and they can only relieve themselves from the binding effect of the recovery against the principal by showing that the amount recovered was in excess of the amount which the plaintiff in the judgment or decree was really entitled to recover, or that he was not entitled to recover at all.

*Id.* at 177 (emphasis added) (citing *Parr v. State*, 71 Md. 220 (1889); *Roberts v. Woven Wire Mattress Co.*, 46 Md. 374, 385 (1877); *Iglehart v. State*, 2 Gill & J. 235 (1830); *Owens v. Collison*, 3 Gill & J. 25, 35 (1830)).  In other words, when the liability of the principal has been established in a proceeding to which the surety was not a party, the liability finding is binding on the surety in a subsequent action against the bond unless the surety rebuts it.  As the Court in *Iglehart* explained, although a surety's "liabilities depend on the acts and confessions of his principal[,]" the surety "cannot be concluded by" a judgment against his principal in a proceeding to which the surety was not a party. 2 Gill & J. at 245.  In that circumstance, "in determining [the surety's] rights, the judgment against [his principal] ought to be considered to have but a *prima facie* influence[.]"  *Id*.  The liability of the principal "should only be deemed in all respects correct, until the contrary is made to appear."  *Id*.  *See also Prescott v. Coppage,* 266 Md. 562, 573 (1972) (stating that "[a] surety is *prima facie* bound by a judgment or decree against its principal" and therefore must offer "offsetting evidence" to avoid being conclusively bound); *Watkins v. State*, 162 Md. 609, 613 (1932) (holding that there is "a settled adherence in this jurisdiction . . . to the view that the judgment against the principal serves as no more than *prima facie* evidence of the claim in the suit against the surety[,]" which the surety may disprove); *Taylor v. State*, 73 Md. 208, 220–21 (1890)

-21-

(stating that "[t]here is a privity in contract between principal and surety, but a judgment or decree against the former is not ordinarily a conclusive, but only a *prima facie*, estoppel against the latter").

In the case at bar, it is undisputed that Hartford was not given notice of Price's petition for return of Estate funds, was not given notice of the July 21, 2014 hearing, was not a party to the petition, and did not participate in the July 21, 2014 proceeding on the petition. Neither the orphans' court nor Sims notified Hartford of the July 2014 Order that resulted from that proceeding. Hartford first learned of that order when it received the orphans' court's August 27, 2014 order directing it to show cause why the bond should not be condemned for $13,566.23.

If Hartford had been on notice of the July 2014 Order, it could have noted an appeal from it, even though it was not a party to the proceedings. As we explained in *Knight v. Princess Builders, Inc.,* 162 Md. App. 526, 533 (2005), non-parties to an orphans' court proceeding who are aggrieved by the court's decision may appeal the decision to the circuit court or this Court pursuant to CJP sections 12-501 or 12-502. *See also Cecil v. Harrington*, 18 Md. 510, 512 (1862) (recognizing the right to appeal from an orphans' court decision as an "aggrieved" non-party). And long ago, in *Gunther v. State,* 31 Md. 21, 34 (1869), the Court of Appeals held that a non-party surety may appeal from a judgment against the principal in the orphans' court, where the order "directed suit to be brought" on the bond and adjudicated the "indebtedness" of the principal to the estate. Significantly, in that case, unlike in the case at bar, the surety was on notice of the proceeding that resulted in the judgment against its principal.

-22-

To be sure, Hartford was aggrieved by the July 2014 Order, by which the orphans' court determined that Sims, its principal, had misappropriated $13,566.23 from the Estate. If Hartford had appealed that order, it would have been conclusively bound by the decision on appeal with respect to Sims's liability. Without knowledge of the July 2014 Order, however, Hartford was not required to note an appeal to challenge it. Contrary to the Estate's argument and to the in banc court's analysis, in an action against the bond, Hartford was not *conclusively* bound by the misappropriation finding in the July 2014 Order. Rather, and also contrary to Hartford's argument that the July 2014 Order had no significance in a subsequent action on the bond, Hartford was "prima facie bound" by the July 2014 Order. In the action on the bond in the orphans' court, the July 2014 Order was evidence establishing that Sims misappropriated $13,566.23 from the Estate; unless Hartford satisfied its burden to produce "offsetting evidence[,]" *Prescott,* 266 Md. at 573, *Grafflin,* 103 Md. at 177, the bond would be condemned for that amount.

Hartford's appeal to the circuit court was taken from the November 2014 Order in the action against the bond. Because an appeal to the circuit court from a judgment of the orphans' court is *de novo*, the trial was to be conducted as if the orphans' court had not held a trial and ruled on the action against the bond. Just as the July 2014 Order was prima facie binding evidence against Hartford that Sims misappropriated $13,566.23 from the Estate in the action against the bond in the orphans' court, it was prima facie binding evidence of that fact in the *de novo* trial in the circuit court.

Accordingly, the trial court erred as a matter of law by refusing to accept the July 2014 Order as evidence that Sims misappropriated $13,566.23 from the Estate and

instead requiring the Estate to produce evidence to prove the misappropriation. The court should have accepted the finding, embodied in the July 2014 Order, that Sims misappropriated $13,566.23 from the Estate as prima facie binding, unless Hartford presented creditable evidence to rebut it.

## II.

### Did the Trial Court Err in Ruling that the Bond Only could be Condemned for $3,256.96?

It is fair to say from this record that the trial court's penultimate ruling, that the Estate could not use the July 2014 Order to prove Sims's misappropriation of Estate funds, must have come as a surprise to both sides. The Estate had moved that order into evidence, without objection, as proof that Sims had misappropriated $13,566.23 from the Estate; and Hartford had geared its evidence to advance its theory that any misappropriation of funds by Sims before March 18, 2013, or after January 8, 2014, was irrelevant, because as a matter of law the bond only could be condemned for the sums misappropriated during that time period. As counsel for Hartford stated in closing,

> Our argument is that the bond wasn't in effect during [all of the misappropriations by Sims]. Whether or not there's been an Order against [Sims], has nothing to do with whether or not our bond should be condemned.

If the Estate's lawyer had anticipated the court's ruling, he would have presented evidence about the misappropriations separate from the July 2014 Order. And if Hartford's lawyer had anticipated the court's ruling, he would not have presented any evidence at all.

In any event, as we have explained, the July 2014 Order was binding evidence that Sims had misappropriated $13,566.23 from the Estate, except to the extent that Hartford introduced creditable evidence to counter it. Hartford did not do so. Rather, it introduced evidence from which the court found that $3,256.96 of the funds misappropriated by Sims were taken by her between the date of the bond and the date she was removed as personal representative. It then argued that any misappropriations by Sims before the date of the bond and after she was removed as personal representative were irrelevant because they were not covered by the bond. The trial court focused on that time frame in its ruling, evidently accepting Hartford's argument. The in banc court reversed, holding, under the authority of *Brown v. Murdock*, *supra*, that the bond applied retroactively, that is, it covered all of Sims's misappropriations from the Estate, including those predating the bond.

Before this Court, Hartford contends the in banc court's holding was legally incorrect, and the trial court's ruling was legally correct, because personal representative bonds are presumptively prospective in coverage. It argues that the pertinent provisions of the Estates and Trusts Article say nothing about retroactive application of bonds; the liability of a surety is a function of the terms of the bond as a contract, and here the terms of the bond do not make it retroactive; *Brown v. Murdock* is distinguishable; and to the extent that any part of that case is relevant, it is dictum.

The Estate's response is two-fold. First, it maintains that whether the bond applies retroactively is not the real issue. The issue is whether Sims breached her statutory duty, as the personal representative of the Estate, to account for, administer, and distribute

Estate assets that came into her hands, as any such breach took place when the bond was in effect.  Specifically, the Estate argues that by statute, and by the January 2014 Order, Sims was duty bound to account for the property belonging to the Estate and turn it over to Price, as her successor, by January 14, 2014.  Her failure to do so was a breach of her duties as personal representative that was committed during the effective period of the bond and therefore was covered by the bond.  As the Estate puts it, the July 2014 Order merely "put on record a breach which actually occurred on January 14, 2014" because "a failure of accounting and delivery by a personal representative is, in fact, the misappropriation of assets that provides grounds for removal and a subsequent attack on the bond."[8]

---

[8] The in banc court took the position, as does Hartford in this appeal, that the Estate waived this argument for appellate review by not raising it before the trial court in the *de novo* appeal. That is incorrect. In opening statement and in closing argument, counsel for the Estate made this very position known:

> The Personal Representative in this case, Vanessa Sims, failed to account for and deliver the $13,566.23 to the new Successor Personal Representative, Charleen Price.
>
> And that's why the lower court decided that it was okay to proceed against the bond. . . .
>
> \*　　\*　　\*
>
> At no point in time does [ET § 6-102(i)(1)] contemplate time delineations for when the bond is in effect. The logical interpretation of this statute is that, when the personal representative's bond is signed, it covers all of the assets that should be in the care of the personal representative….And the next thing, if the personal representative has a statutory duty under [ET § 7-301], to account for his management and distribution of property. . . .  For failure to do this, would cover all the property under the management of the [personal representative]. At all points in time from April 14th, 2003 until

(Continued…)

-26-

The Estate makes the alternative argument that, if we address the issue of retroactivity, we should conclude that retroactive application is permitted. It maintains that there is no case on point in Maryland, but *Brown v. Murdock* "comes extremely close." It also cites *In re Foodsource, Inc.*, 130 B.R. 549 (Bankr.N.D.Cal. 1991), in support.

We agree with the Estate's primary argument, which is that the issue before us is not one of retroactive application of the bond. Moreover, we do not read *Brown v. Murdock* and related cases to concern retroactive application of a bond. They too involve situations in which the breach of duty took place while the bond was in effect.

As noted, the Estate was opened as a "small estate," within the meaning of Md. Code (2001, 2011 Repl. Vol., 2016 Supp.), section 5-601 through 5-607 of the Estates and Trust Article ("ET"). An estate may be administered as a small estate if at the time of the decedent's death its value is $50,000 or less. ET § 5-601.[9] Unless excused or waived, the personal representative of a small estate must give bond if the estate has a

_____

(…continued)

> her removal on January 8th, 2014, Vanessa Sims was a Personal Representative who accounted for none of her management and distribution of the property of the Estate. Therefore, her bond should cover that period.

These statements plainly articulate that Hartford's liability ought to result from Sims's failure to account for Estate assets that should have been in her possession when she was removed as personal representative.

[9] As noted, when Mr. Sanders died, that statute provided that an estate could be administered as a small estate if at the time of the decedent's death its value was $30,000 or less.

gross value of $10,000 or more after payment of expenses and certain allowances. ET §

5-604(a). "Except to the extent inconsistent with the letter and spirit of [the Small

Estates] subtitle, all other provisions of the estates of decedents law shall be applicable to

a small estate." ET § 5-607. The small estates subtitle does not address the wording of

the bond that must be given, the general duties of the personal representative, or the

personal representative's duties upon removal, all of which are relevant to our analysis

and are covered in other provisions of the ET Article; nor does it include any provisions

inconsistent with those other provisions. We therefore look to other provisions of the ET

Article for guidance on those issues.

Subtitle 6 of the ET Article governs "The Personal Representative." ET section 6-

102, "Bond," provides that personal representative bonds, when required, shall be from

the personal representative "to the State of Maryland for the benefit of all interested

persons and creditors" and shall be executed "with a surety or sureties approved by the

register [of wills]." ET § 6-102(a). The form of the personal representative's bond is

prescribed, in ET section 6-102(h)(1), to be substantially as follows:

> The condition of the above obligation is such, that if………shall well and
> truly perform the office of the personal representative of……, late of……..,
> deceased, according to law, and shall in all respects discharge the duties
> required of him by law as personal representative without any injury or
> damage to any person interested in the faithful performance of the office,
> then the above obligation shall be void; it is otherwise to be in full force
> and effect.

-28-

*See also* Md. Rule 6-312(a) (setting forth the form of a personal representative's bond).[10]

The bond acquired by Sims from Hartford tracked the language of the statute and the rule:

> As of this 18th day of March, 2013, Vanessa Sims as personal representative of the Estate of Robert L. Sanders as principal and HARTFORD FIRE INSURANCE COMPANY as surety are obligated to the State of Maryland for the benefit of all interested persons and creditors in the sum of $20,000 Dollars.
>
> If the personal representative shall perform the duties of the office of the personal representative of the estate of the decedent according to law, and in all respects shall discharge the duties without any injury or damage to any person interested in the faithful performance of the office, then the obligation shall be void.

"A personal representative is a fiduciary" and, in the case of an intestate decedent, is "under a general duty to settle and distribute the estate . . . in accordance with the . . . estates of decedents law as expeditiously and with as little sacrifice of value as is reasonable under the circumstances." ET § 7-101(a). The ET article imposes specific duties upon the personal representative in the administration of the estate. *See* ET §§ 7-101, 7-201 through 7-205, and 7-301 through 7-307. *See also Randall v. State*, 223 Md. App. 519, 563–64 (2015) (detailing the statutory duties of personal representatives). The personal representative's duties include the duty to account:

> A personal representative shall file written accounts of his management and distribution of property at the times and in the manner prescribed in this

---

[10] Chapter 200 of the 600 Rules governs small estates. It provides at Rule 6-222 that for estates having a gross value of $10,000 or more after the payment of certain allowances and expenses, and unless bond is waived or excused, the form of the personal representative's bond shall be as set forth in Rule 6-312(a).

subtitle, with a certification that he has mailed or delivered a notice of the filing to all interested persons.

ET § 7-301.

The failure to render an account is a ground for removal of a personal representative under ET section 6-306. *See* ET § 7-306. That statute enumerates several grounds for removal, including mismanaging property and failing, "without reasonable excuse, to perform a material duty pertaining to the office." ET §§ 6-306(a)(4) and (6). The times for rendering accounts, stated in ET section 7-305, include "upon termination of the appointment of the personal representative, as provided in Title 6, Subtitle 3 of this article[.]" ET § 7-305(a)(3).

More specifically, and regardless of the reason for removal of the personal representative, a personal representative who has been removed "shall account for and immediately *deliver the property belonging to the estate to his successor*[.]" ET § 6-306(e) (emphasis added). Rule 6-452(d), "Account of removed Personal Representative," is even more explicit:

> Upon appointment of a successor personal representative . . . , the court shall order the personal representative who is being removed from office to (1)*file an account with the court and deliver the property of the estate to the successor personal representative . . .* or (2) comply with Rule 6-417(c).[11]

(Emphasis added.)

---

[11] Under Rule 6-417(c), when the estate has no assets, the personal representative is to file an affidavit of no assets in lieu of an account.

These statutes and rules make clear that a personal representative has an ongoing fiduciary duty to account for the property belonging to the estate and, when removed from office, to deliver that property to the successor personal representative. Here, the orphans' court removed Sims as personal representative by order of January 8, 2014, which, in conformity with Rule 6-452(d), directed her to file an accounting and deliver the property of the Estate to Price, the successor personal representative, by January 14, 2014. Her failure to do so was a breach of her duties as the personal representative of the Estate under ET § 6-306(e) and was a failure to "perform the duties of the office of the personal representative of the estate of the decedent according to law" as required by the plain language of the bond. If Sims had paid the misappropriated $13,566.23 to Price, as the July 2014 Order directed her to do, her breach of duty would have been without injury or damage to Princess Sanders, the decedent's sole heir. But she did not do so.

Hartford's argument rests on the fallacy that a personal representative who misappropriates estate assets only breaches her duty to the estate at the exact time of the misappropriation. Misappropriating estate funds is a wrongful act that can be the basis for removal of the personal representative; and when that happens, a breach of duty is committed when the removed personal representative fails to account for and deliver to the successor personal representative the property belonging to the Estate. If the personal representative does not repay the Estate, the surety will be liable for the full extent of the unsatisfied judgment against the personal representative, regardless of when she misappropriated the Estate funds. This is consistent with the condition of the bond that

-31-

the personal representative discharge her duties without "any injury or damage." § 6-102(a)-(h)(1).

Although not on point, *Brown v. Murdock,* 16 Md. 521 (1861), is consistent with this reasoning. That case concerned a counter-security bond, which then was governed by statute and now is governed by rule. *See* Md. Rule 1-403(a); 6-102(i)(1). The sureties on a testamentary bond obtained a counter-security bond that would indemnify them for any judgment entered by reason of their suretyship. Several years later, a judgment was entered against the sureties and the executors of the estate for losses to the estate caused by mismanagement by the executors. When the sureties sought to recover against the counter-security bond, the counter-sureties responded that their bond did not apply because the mismanagement predated it.

The case reached the Court of Appeals, which disagreed with the counter-sureties. It explained that the "intent and provisions" of the statute authorizing counter-security bonds is to protect the surety on the original bond from "apprehended loss" to the estate due to a breach of trust by the executors. *Id.* at 531. The language of the counter-security bond covered payment to the sureties for a judgment against them based on mismanagement by the executors, even if the mismanagement predated the execution of the counter-surety bond:

> We are of opinion that the condition of the bond embraces the matter relied upon as a breach, even if we concede that the [executors' mismanagement] had occurred before the execution of the bond….The pleas, which present this question, admit the recovery and payment of the judgment as alleged in the declaration, and repayment of the money is within the plain meaning of the instrument…

*Id.* at 530–31.

The Court rejected the counter-securities' argument that "this view of the case makes the bond operative beyond the intent of the parties in entering into the contract, and fraudulently, because retrospectively." *Id.* at 531. The counter-security bond is to indemnify the sureties on the original bond against a judgment entered against them due to the liability of their principals, without a requirement that the wrongful acts post-date the counter-security bond. "Where the law requires counter-security, parties becoming liable on such bonds should ascertain the condition of the administration before they incur the risk." *Id.* The liability on the counter-security bond arises upon judgment, which is after the date of the bond, even if the wrongful acts on which the judgment is based predate the counter-security bond. Accordingly, the bond applies, but is not being applied retroactively.

The Court of Appeals faced an analogous question seventy years later, in *Employers' Liability Assurance Corp. v. State,* 163 Md. 119 (1932). There, Baker, the assignee of a mortgage, brought a foreclosure action and posted a bond. He then misappropriated the proceeds of the foreclosure sale. When suspicions arose that he had falsely reported a sales price lower than that actually paid, the prior owner of the property petitioned the court for a second accounting of the proceeds of the sale. The court ordered Baker to file a new bond in an amount equal to the actual purchase price. The bond was authorized by statute to "be and remain as an indemnity to and for the security of all persons interested[,]" and conditioned satisfaction on Baker's "well and faithful[l]" performance of the "trust reposed in him . . . and his duty under the law." *Id.* at 125.

-33-

Baker died soon thereafter, and the assignors of the mortgage sought to recover the foreclosure proceeds from his estate and from the sureties on the new bond. The sureties refused to pay, arguing—like the counter-sureties in *Brown*—that Baker had received and used the foreclosure proceeds for his own benefit before the "execution and delivery of the additional bond." *Id.* at 126. As in *Brown,* the Court of Appeals rejected this argument, reasoning that it was "based upon a misconception of the nature of the contractual relation and obligations assumed by the assignee or trustee and his surety." *Id.* at 127. The Court explained that it was Baker's failure to repay the funds *upon demand* that was the breach that resulted in liability of the sureties:

> The willful and fraudulent appropriation by a trustee for his individual use of the moneys held by him in trust is at once a breach of trust, for which, upon proper procedure, the trustee may be removed. . . . His civil liability and that of his surety for his breach of duty ends, however, if, at any time between the wrongful appropriation of the money or trust funds and the bringing of an action on the bond, the trustee should make full restitution, so that no loss or injury resulted from his breach as a fiduciary.

> \*   \*   \*

> [W]hen [the surety] entered into a bond whose language explicitly bound him to a prospective obligation, without any express exemption in the event the assignee did not have the money in hand because of a previous use for his personal benefit or other unauthorized disposition, the surety cannot escape the risk of his contract…to protect the parties in interest against any loss, however caused by the assignee, at the time fixed for the payment of the fund.

*Id.* at 127–29 (internal citations omitted). In short, the Court concluded that "'it would be unjust and impolitic to deprive'" a beneficiary of his "'stipulated right to have the whole trust fund paid over at the end of the trust . . . however old the original breach of trust may be.'" *Id.* at 134–35 (quoting *McKim v. Glover*, 161 Mass 418, 421–22 (1894)).

Neither *Brown* nor *Employers' Liability* authorize the retroactive application of a personal representative's bond. As noted, the *Brown* Court rejected the notion that its "view of the case makes the bond operative beyond the intent of the parties . . . retrospectively[,]" 16 Md. at 531, and in *Employers' Liability,* the Court observed that trustee's bonds may not be condemned retroactively for defaults both "'committed and fully consummated'" entirely pre-bond. 163 Md. at 132 (quoting *State v. Banks*, 76 Md. 136, 145 (1892)). That is, when the trustee has misused funds *and* already has failed to account to the court "before the execution of the bond[,]" the surety will not be liable. *Id.* (citing *Banks,* 76 Md. 136). These decisions stand for the proposition that a surety on a fiduciary bond will be prospectively liable for judgments against the principal during the period of the bond.

Modern decisions from other jurisdictions are in line with the holdings in *Brown* and *Employers' Liability*. In *In re Foodsource, Inc.*, 130 B.R. 549, cited by the Estate, the court held that the sureties on a later-filed, additional trustee's bond were liable for the trustee's pre-bond embezzlement. It reasoned that the trustee's failure to satisfy the judgment against him was a breach of his duty to finally account for the embezzled funds:

> The surety on the later-filed bond is not held liable for the defalcations or misappropriation, committed prior to the bond's issuance, *per se*; rather, the surety is held liable for the trustee's failure to account for those misappropriated or converted funds and to pay them over *during* the term of the later-filed bond.

*Id.* at 563 (emphasis in original). The *Foodsource* court explained that an administrator's duty to account for all the estate's assets distinguishes statutory fiduciary bonds:

> 'Under [fiduciary's] bonds, the sureties are liable for the failure of their principal to account even though the initial wrong-doing antedates the bond. The resulting duty to make good the loss continues to the end.'
>
> *Bromen v. O'Connell,* 185 Minn. 409 (1932). In short, most authorities recognize court-fiduciary bonds as a distinct sub-class within the category of official bonds. They have been held subject to the special rule that later-filed, additional court-fiduciary bonds cover defalcations during the [fiduciary's] entire term, which, as the term is continuous, may have occurred prior to the bond's issuance.

*Id.* at 561 (additional citations and footnote omitted). Similarly, the Arizona Court of Appeals held in *In re Guardianship of Pachecho* that "bonds issued for the protection of persons and estates" are unique in purpose, such that an administrator's pre-bond misconduct has no bearing on the "obligation" of the surety to "insure" that she "faithfully account[s] for the funds she controlled" as administrator. 219 Ariz. 421, 425–26.

Other courts likewise have concluded that a surety's liability does not depend on *when* missing estate funds "were actually misapplied or lost"; the bond is not breached "until there is a failure to account or pay over the money as ordered by the . . . court." *Bellinger v. Thompson,* 26 Or. 320, 341–42 (1894); *Estate of Camarda,* 103 Misc.2d 362, 367 (N.Y. 1980) ("[W]hen the executrix did not pay over to the heirs the amount of their legacies and otherwise refused to comply with the order of this court, it is a breach of the bond"); *see also S. Surety Co. v. Burney*, 126 P. 748, 751 (Okla. 1912) ("It is immaterial when the conversion or misappropriation took place. . . . When the settlement is had, the amount of his indebtedness adjudged, and the order of the court made . . . and are not obeyed by the [administrator], a breach of the bond is effected"); *Ellyson v. Lord,* 124

Iowa 125, 139 (1904) (holding "[t]he breach of duty as to which the bond is given as security is the failure to make a final accounting"); *Choate v. Arrington,* 116 Mass. 552, 557 (1875) ("If [the executor] has never properly disposed of and accounted for [the estate], he is bound to account for it now; and the sureties upon his bond, whenever given, are held for his faithful performance of that duty.") (additional citations omitted); *Pinkstaff v. People,* 59 Ill. 148, 150–51 (1871) (noting estate administrator's "breach" for which the sureties were held liable was his failure to "pay [funds] over to the persons entitled to receive them, when duly called upon" by the court).

For these reasons, in the case at bar, the trial court erred in ruling that the bond only could be condemned for the sum of money it found was misappropriated from the Estate by Sims after the date of the bond and during the period she was sole personal representative. The July 2014 Order was evidence that Sims misappropriated $13,566.23 from the Estate. Hartford did not present evidence to rebut that; indeed, at most, its evidence, as credited by the trial court, showed that part of the money was misappropriated after the date of the bond. The bond covered Sims's breach of her duty to account and turn over the property of the Estate upon being removed as personal representative, however, which did not pre-date the bond. On the evidence before the trial court in the *de novo* appeal from the orphans' court's November 2014 judgment, the bond should have been condemned for $13,566.23.

## III.

### Did the In Banc Court Abuse its Discretion by Denying Hartford's Motion to Alter or Amend?

Finally, Hartford contends the in banc court abused its discretion by denying its motion to alter or amend. It makes no argument specific to that contention, stating simply that the in banc court should have recognized that its various decisions, that Hartford now challenges on appeal, were wrong and should have granted the motion for that reason. We already have explained that the in banc court's final disposition—reversing the judgment of the trial court and entering judgment against Hartford on the bond for $13,566.23—was correct, although not for the reasons it gave. For the same reasons, the in banc court did not abuse its discretion by denying Hartford's motion to alter or amend judgment.

There is a twist to this issue that we must address, however, because it implicates whether we have jurisdiction over this appeal. Hartford cited Rule 2-534 in moving to alter or amend the in banc court's judgment. That rule provides, in relevant part:

> In an action decided by the court, on motion of any party filed within ten days after entry of judgment, the court may open the judgment to receive additional evidence, may amend its findings or its statement of reasons for the decision, may set forth additional findings or reasons, may enter new findings or new reasons, may amend the judgment, or may enter a new judgment.

Under Rule 8-202(c), when a Rule 2-534 motion is timely filed, *i.e.*, filed within ten days of entry of the judgment, the deadline for filing a notice of appeal from the underlying judgment is 30 days after the entry of a notice withdrawing the motion or 30 days after the entry of an order disposing of the motion. Here, Hartford's motion was

timely filed, and its notice of appeal was filed within 30 days of the in banc court's entry of its order denying the motion. Its notice of appeal was not filed within 30 days of the in banc court's judgment, however. So, if, as a party to an in banc review proceeding in the circuit court, Hartford was entitled to file a motion to alter or amend, its appeal was timely noted; but if it was not so entitled, its appeal was not timely noted. And if the appeal was not timely noted, we lack jurisdiction over it. *Griffin v. Lindsey*, 444 Md. 278, 285–86 (2015) ("The 30–day requirement for notices of appeal 'is jurisdictional; if [it] is not met, the appellate court acquires no jurisdiction and the appeal must be dismissed.'" (quoting *Houghton v. Cnty. Comm'rs of Kent Cnty.,* 305 Md. 407, 413 (1986), *superseded by Rule on other grounds as stated in Hiob v. Progressive Am. Ins. Co.,* 440 Md. 466 (2014))).

Rule 2-551 contemplates that a post-judgment motion may be filed with respect to the trial court's judgment, as it extends the deadline for filing a notice for in banc review based on the timing and resolution of any such motion. *See* Md. Rule 2-551(b). It does not allow or prohibit post-judgment motions following the entry of the in banc court's judgment, however. It says nothing about them at all. The question, then, is whether the language of Rule 2-534 can be read to permit the filing of a motion to alter or amend a judgment entered by an in banc court, not just a judgment entered by a trial court based on a court decision. We think it can, for two reasons.

First, as quoted above, "'[i]n an action decided by the court," Rule 2-534 authorizes the court, on motion of a party filed within ten days of the entry of judgment, to alter or amend the judgment in any of the specified ways, including to state new

reasons for its decision and to change the decision. As pertinent here, an "action" is defined to "mean[] collectively all the steps by which a party seeks to enforce any right in a court . . . ." Md. Rule 1-202(a). A "proceeding" is "part of an action." Md. Rule 1-202(v). Although the three circuit judges who comprise an in banc panel act in an appellate capacity, to review the judgment of the trial judge, the in banc review is properly viewed as a proceeding that is part of an action in the circuit court. Therefore, a party to an in banc proceeding may file a motion to alter or amend the in banc court's judgment, under Rule 2-534, and of course the in banc panel is authorized to take any action that rule permits in ruling on the motion. Thus, the plain language of Rule 2-534 encompasses motions to alter or amend a judgment entered by an in banc panel of the circuit.

Second, it would not be reasonable to read Rule 2-534 otherwise. To be sure, the in banc panel will not be revising any factual findings, because it will not have made any. Its function is purely legal. Nevertheless, in response to a motion to alter or amend, the panel may explain its legal analysis more fully or change it, which may result in a changed decision—and a change in whether its decision is subject to appeal. It would undermine judicial efficiency to read Rule 2-534 as not affording an in banc court the opportunity to change its mind on an appellate issue once given a valid reason to do so by a party. Rule 8-605 provides that opportunity for this Court and the Court of Appeals, and it makes sense that an in banc panel, also sitting in an appellate capacity, also would have that opportunity.

Accordingly, Hartford was entitled to file a Rule 2-534 motion to alter or amend the in banc court's judgment. As it did so timely, its deadline to note an appeal to this Court was 30 days after the in banc court entered its order denying the motion to alter or amend. The notice of appeal was filed within that period and therefore was timely; and we have jurisdiction over this appeal.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**